El Pueblo de Puerto Rico, demandante y apelado, *v.* Joaquín Morales Orama, acusado y apelante.

No. 4929.—*Sometido:* Marzo 17, 1933. *Resuelto:* Junio 2, 1933.

*Celestino Iriarte* y *F. Fernández Cuyar,* abogados del apelante; *R. A. Gómez, Fiscal,* abogado de El Pueblo, apelado.

EL JUEZ PRESIDENTE SEÑOR DEL TORO emitió la opinión del tribunal.

Este caso se originó a virtud de acusación presentada por el Fiscal del Distrito de San Juan, mediante información del Gran Jurado, imputando a Joaquín Morales Orama,

Sargento de la Policía Insular, un delito de asesinato, como
sigue: ". . . . allá por el 16 de marzo de 1930, en Toa Alta
. . . de una manera ilegal, voluntaria, con malicia preme-
ditada y expresa y firme y deliberado propósito de matar,
y demostrando tener un corazón pervertido y maligno, dió
muerte ilegal al ser humano Antonio Vázquez Mojica, al
cual le acometió y agredió con un revólver, infiriéndole va-
rias heridas de bala, de carácter grave, y a consecuencia de
dichas heridas recibidas falleció el mencionado Antonio Váz-
quez Mojica, el día 16 de marzo de 1930, en Toa Alta, y que
tales heridas fueron inferidas por el acusado Joaquín Mo-
rales Orama, al hoy interfecto Antonio Vázquez Mojica, con
la intención de matarlo, . . .''

Celebrado el juicio ante un jurado, éste rindió su vere-
dicto declarando al acusado culpable de un delito de homici-
dio voluntario y la corte dictó sentencia condenándolo a su-
frir la pena de cinco años de presidio con trabajos forzados.
No conforme, apeló, señalando en su alegato la comisión de
siete errores.

Sostiene por el primero que la corte sentenciadora
erró al negar su segunda moción de traslado, aceptando la
devolución del caso por la Corte de Distrito de Bayamón,
a la cual lo había trasladado.

Como hemos dicho, la acusación se presentó en la Corte
de Distrito de San Juan.  Ante esa corte compareció el acu-
sado y pidió que su causa se trasladara a la del distrito de
Bayamón que acababa de crearse, porque los testigos resi-
dían en pueblos comprendidos dentro del territorio de la
nueva corte.  Se allanó el Fiscal del Distrito de San Juan
y la corte decretó el traslado.

Así las cosas, radicada la causa en la Corte de Distrito
de Bayamón, compareció ante ella su fiscal y le pidió que
se declarara sin jurisdicción para conocer de la causa y la
devolviera a la corte de distrito de su origen.  Resolvió la
corte de conformidad, exponiendo sus razones en la opinión
que sigue que constituye en sí misma el mejor argumento

que pudiéramos ofrecer en pro de la no existencia del error. Dice:

"El art. 8 del Código de Enjuiciamiento Criminal dispone lo que sigue:

" 'La jurisdicción correspondiente a los delitos radica en la corte del distrito del respectivo distrito judicial dentro del cual se cometieren.'

\* \* \* \* \* \* \*

"La regla general es que todo delito debe ser juzgado en el distrito que se cometiere, y la excepción es cuando la ley confiere expresamente jurisdicción a una corte para conocer de delitos cometidos fuera de su territorio. Pueblo v. Ruiz, 19 D.P.R. 94, 96.

"Esta teoría de Puerto Rico es la misma de los tratadistas norteamericanos. En 16 C. J. 185, pár. 260 se lee:

" 'Generally speaking, it is a fundamental rule of criminal procedure that one who commits a crime is answerable therefor only in the jurisdiction where the crime is committed, and in all criminal prosecutions, in the absence of statutory provision to the contrary, the venue must be laid in the county or district of the offense, and must be proved as laid.'

"La sección 1 de la Ley 57 de 1930, creando la Corte de Distrito de Bayamón, dispone:

" ' . . . que la Corte de Distrito de San Juan, tal y como está constituída en la actualidad, tendrá jurisdicción para seguir conociendo de toda . . . causa . . . criminal . . . que esté pendiente en la actualidad ante dicha Corte de Distrito de San Juan proveniente de cualquiera de los municipios que por la presente ley pasan a formar la Corte de Distrito del Distrito Judicial de Bayamón.'

"Por razón de estas disposiciones estatutorias, la Corte de Distrito de San Juan tendrá jurisdicción para seguir conociendo de toda causa criminal pendiente el 29 de julio de 1930 en aquella corte y proveniente de un municipio que ahora forma parte de esta nueva Corte de Distrito.

"En 16 C. J. 197, pár. 296 se lee:

" 'Where the territory in which a crime has been committed is created into a new county by the subdivision of the old county or otherwise, the courts of the new county have exclusive jurisdiction, unless the jurisdiction of the courts of the old county is continued by the statute.'

'En el caso Pueblo v. Andrades, 35 D.P.R. 441 se llama la aten-

ción a la anterior cita y en el resumen del caso se condensa así la doctrina:

" 'Cuando la demarcación territorial dentro de la cual se comete un delito se incluye dentro de los límites territoriales de otro distrito nuevamente creado, la corte de este distrito tiene jurisdicción exclusiva del delito a menos que la jurisdicción de la corte del viejo distrito no se continúe por el estatuto que reorganizó dichos distritos.'

"La Ley No. 57 de 1930 dispone que la Corte de Distrito de San Juan tendrá jurisdicción sobre los casos criminales pendientes ante ella al aprobarse la misma. La ley, pues, dispuso que dicha corte continuará conservando su jurisdicción para conocer de aquellos asuntos. No la reservó a la nueva corte, ni a ninguna otra distinta de aquélla.

"Jurisdicción es la potestad de que se hallan investidos los jueces para administrar justicia, y tal potestad ha de emanar directa e inmediatamente de la ley. Ex parte Bou, 7 D.P.R. 132. La corte ha de tener jurisdicción sobre el delito y sobre la persona del acusado. Ex parte Thomas, 12 D.P.R. 367. Para que exista jurisdicción debe concurrir, entre otros elementos, el que la corte haya sido autorizada para conocer del asunto que se le somete. Ex parte Le Hardy, 17 D.P.R. 1024.

"La Corte de Distrito de Bayamón no ha sido investida de jurisdicción, para conocer de este caso, de manera directa e inmediata por la ley, sino, por el contrario, la de San Juan. La Corte de Bayamón no ha sido autorizada para conocer de este asunto. Lo fué la de San Juan por manera expresa de la ley.

"No existe, pues, duda alguna, de que la regla general provista en el art. 8 del Código de Enjuiciamiento Criminal de que la jurisdicción correspondiente a los delitos radica en la corte del distrito donde el delito se cometió tiene su excepción y es cuando la ley confiere expresamente la jurisdicción a otra corte; y que la Corte de Distrito de San Juan conservó por disposición expresa de la ley su jurisdicción en todas las causas criminales ante ella pendientes el 29 de julio de 1930, al crearse la corte y el territorio judicial del distrito de Bayamón.

"La teoría de que el acusado tiene derecho a ser juzgado por sus convecinos, no es un derecho constitucional. La Enmienda Sexta a la Constitución de los Estados Unidos, no rige en Puerto Rico. People v. Tapia y People v. Muratti, 245 U. S. 639; People v. Balzac, 258 U. S. 298. Y la Ley Jones no contiene ninguna cláusula dispositiva en tal sentido. Nuestra Carta Orgánica garantiza en su sec. 2 el derecho del acusado a un juicio rápido y público, pero nada ex-

presamente dice en cuanto al jurado ni al distrito. Estudiando esa Carta se dijo que el puertorriqueño no puede insistir en el derecho a juicio por jurado, salvo que sus propios representantes en su Legislatura se sirvan concedérselo. People v. Balzac, supra.

"En Puerto Rico el juicio por jurado es un privilegio estatutorio. Siguiendo el estatuto, que no es otro que el Código de Enjuiciamiento Criminal, nos encontramos que el art. 178 dispone que las cuestiones de hecho en casos de delitos graves . . . habrán de ser juzgadas por el jurado, cuando el acusado lo pidiere; y el art. 184 dice que un jurado es un cuerpo de hombres elegidos de entre los habitantes de determinado distrito y revestido de poder para conocer como juez en cuestiones de hecho.

"Nada hay en la ley que indique que un acusado que cometió un acto delictivo dentro de la jurisdicción de una corte tenga que ser juzgado por sus convecinos, sino por los hombres de determinado distrito, o sea, por aquéllos del distrito judicial en que el delito se cometió. La ley garantiza al acusado un juicio en el distrito donde el delito fué cometido y ante jueces de hechos elegidos de entre los habitantes de ese mismo distrito, es decir, de habitantes del lugar de la comisión del delito.

"Si el acusado lo está por haber cometido un delito en Toa Alta, asunto sobre el cual la Corte de San Juan mantiene jurisdicción expresa a tenor de la ley porque el delito se cometió dentro de su teritorio y el caso estaba pendiente ante ella el 29 de julio de 1930, los hombres llamados a juzgar los hechos son aquéllos del lugar donde el acto delictivo se cometió.

"La cuestión de celebrar los juicios criminales en el distrito correspondiente es una de orden público que afecta en primer término al estado, a la comunidad en general. El distrito corespondiente para la celebración de un juicio es aquél que la ley señala, y no se puede variar a no ser en los casos específicos que la ley autoriza. El art. 171 del Código de Enj. Criminal determina esos casos.

"En el presente caso el acusado pidió el traslado del mismo a esta Corte y le fué concedido porque 'dentro de su jurisdicción fué cometido el delito que se le imputa.' Esa actitud del acusado, prestando una sumisión, nada significa. Ello no afecta a la cuestión jurisdiccional. En Pueblo v. Paz, 12 D.P.R. 100, 104, se ha dicho que:

" 'El artículo 8º del Código de Enjuiciamiento Criminal terminantemente expresa que la jurisdicción correspondiente a los delitos, radica en la corte de distrito del respectivo distrito judicial dentro del cual se cometieren.'

" 'Es regla general que en materias criminales no puede prorro-

garse la jurisdicción de una corte incompetente y por eso nuestro Código de Enjuiciamiento Criminal no reconoce ni autoriza la sumisión de las partes a determinada corte de jurisdicción y el fundamento es seguramente, el que en lo criminal la jurisdicción se ha establecido, no sólo atendiendo al interés de los ofensores y de los ofendidos, sino también al de la sociedad.

    ✻    ✻    ✻    ✻    ✻    ✻    ✻

" 'En materia civil las partes contendientes son las únicas interesadas y pueden, sin inconveniente alguno, pactar esa sumisión y contra ese pacto lícito, autorizado y que a nadie perjudica, nadie puede mostrarse querelloso, pero en materia criminal los intereses atendibles son distintos, y no puede aplicarse en ella el principio de la sumisión.'

"Esa doctrina concuerda con la de los tribunales de la nación. En 16 C. J. 176, pár. 231, se dice:

" 'Jurisdiction to take cognizance of an offense or to render a particular judgment cannot be conferred upon a court by the consent of accused, either express or inferential; where it has none by statute, as by failure to object, as jurisdiction of the subject matter must be conferred by law; but where a court has jurisdiction of the subject matter, jurisdiction of the person of defendant may be conferred by consent or waiver; and a statute may authorize a court to try a criminal case by consent of parties.'

"Razonamientos generales que deben tomarse en cuenta aparecen en Ex parte Thomas, 12 D.P.R. 370; Fajardo v. Soto, 23 D.P.R. 77; Pueblo v. Nogueras, 23 D.P.R. 332; Pueblo v. Rivera, 30 D.P.R. 563, 564.

" 'Cuando los procedimientos seguidos en una corte disponiendo un cambio de lugar (venue) para el juicio son tan irregulares que los hacen enteramente nulos, la corte a donde ha sido trasladado el caso no adquiere jurisdicción, y la cuestión puede ser levantada en cualquier tiempo en el curso de los procedimientos en aquella corte.' 16 C. J. 221, pár. 339.

"La orden que motiva esta resolución es enteramente nula. Monta a tanto como investir a esta Corte de una nueva jurisdicción. Los tribunales no legislan. Y cualquier sumisión o conformidad del acusado con esa orden, no tiene más alcance que el de la sumisión a un acto nulo *per se*. No se trata de un derecho constitucional que quizá el acusado podría renunciar, sino de investir a un tribunal de una jurisdicción que no le ha dado la ley; y de despojarse otro tribunal de la jurisdicción que la ley le confirió expresamente. En Puerto

Rico la ley no contempla esta clase de fundamentos para traslado de una causa criminal de un sitio a otro.

" 'La jurisdicción para juzgar y castigar un delito no puede ser adquirida en otra forma que en el modo prescrito por la ley, y si no es adquirida así cualquier sentencia es nula.' 16 C. J. 176.

"Para que un traslado sea legal debe estar autorizado por la ley. La orden disponiendo el traslado de esta causa de San Juan a Bayamón, se basa en fundamentos erróneos. Las razones expresadas en la orden no son suficientes. Es contraria a la Ley 57 de 1930. Y esta Corte no tiene más que hacer sino trasladar nuevamente el caso a la Corte de Distrito de San Juan.

"En el caso Pueblo v. Díaz, 18 D.P.R. 912, 919, refiriéndose a una orden del Juez de Guayama disponiendo el traslado de cierta causa a Ponce, se decidió lo siguiente:

" 'La orden dictada por él el día 4 de mayo de 1911, fué nula y el juez no tenía más que hacer sino trasladar nuevamente el caso a la Corte de Distrito de Guayama como así lo hizo debida y prontamente, de acuerdo con la ley.' "

La Corte de Distrito de San Juan estuvo enteramente justificada al negar la segunda moción de traslado que se le presentara al radicarse la causa nuevamente en ella.

■ ■ El segundo señalamiento se formula así: "La Corte erró al permitir que Miguel Gandía, amigo y compañero del interfecto, actuara como jurado, a pesar de la recusación motivada de la defensa."

Hemos estudiado cuidadosamente tanto los argumentos del apelante y del fiscal como los hechos del caso y a nuestro juicio habiendo manifestado el jurado que su inclinación favorable al interfecto por el conocimiento previo que de él tenía y por la lectura de lo que publicó la prensa sobre el suceso no lo habían llevado a formar una opinión definitiva y que daría su veredicto de acuerdo con la prueba que se practicara, la corte actuó correctamente al negar su recusación. Tampoco consta que el acusado agotara sus recusaciones perentorias. *El Pueblo* v. *Cortés*, 42 D.P.R. 923, 925.

■ Por el tercer señalamiento se sostiene que "la corte erró en sus instrucciones al jurado, en lo que respecta a

defensa propia.'' Argumentándolo dice el apelante en su alegato:

"La teoría principal de la defensa en este caso fué la de la defensa propia.

"Hablando sobre ésta, el Juez, en sus instrucciones, dijo al Jurado lo siguiente:

" 'Para justificar un homicidio, en que se alegue la propia defensa, es necesario no sólo creer sino tener motios fundados para creer que al matar al agresor se hallaba el agredido en inminente o inmediato peligro de muerte o de grave daño personal. Las circunstancias deberán ser de tal naturaleza que lleven al ánimo de una persona de moderada prudencia el convencimiento de que se hallaba en peligro de muerte o de grave daño personal. Fundado temor no significa el temor de un cobarde sino el temor de una persona de moderado valor.'

"Insistiendo en esta misma teoría, más adelante se expresó así:

" 'Pero esta creencia o temor no debe ser la de un cobarde sino la de una persona de moderado valor, de espíritu sereno.'

"De estas instrucciones resulta palmariamente que el Juez, consciente o inconscientemente, presentó al acusado a los ojos del jurado como un cobarde, o cuando menos, dejó entrever a los jueces de hecho que había llegado a la conclusión de que el acusado quitó la vida a su subalterno por pura cobardía.''

No estamos conformes. La ley sobre la materia, el artículo 210 del Código Penal, expresa:

"Artículo 210. La mera sospecha de la comisión de cualquiera de los delitos mencionados en los números 2 y 3 del anterior artículo, para impedir los cuales puede legalmente cometerse el homicidio, no bastará para justificarlo; sino que las circunstancias que concurran deberán ser suficientes para excitar el temor de una persona razonable y será preciso que el matador obre sólo bajo la influencia de dicho temor.''

Es cierto que la ley no dice textualmente "el temor de un cobarde'', ni "persona de moderado valor'', sino que las circunstancias que concurran deberán ser suficientes para *excitar el temor de una persona razonable,* pero es la verdad que una persona razonable en tal caso lo es una de moderado valor, no aquella que pueda ser calificada de cobarde. El tipo de persona que tuvo en mente el legislador

fué el normal y presentar ese tipo y no otra cosa es el efecto de la instrucción de la corte.

Además, no fué sólo en el párrafo transcrito en el que la corte transmitió su instrucción. Dos párrafos más la completan y leyéndolos se concluye que la corte informó al Jurado clara y acertadamente sobre el particular.

■■■ El cuarto señalamiento es el de que erró la corte al no admitir en evidencia las amenazas de muerte que se intentaron probar por el testigo Eugenio Santoni.

Al comenzar a declarar el testigo, aparece de la transcripción que ocurrió lo siguiente:

"Fiscal: Si mal no recuerdo, la defensa, cuando presentaba la teoría de su caso al Jurado le dijo que el acusado desconocía esas amenazas.—Martínez Nadal: Sí.—Fiscal: ¿Que las desconocía?— Martínez Nadal: Sí, señor."

El fiscal se opuso y la corte resolvió:

"No demostrándose que el acusado tuviera conocimiento de las manifestaciones del interfecto ni que éstas fueran notificadas; ni existiendo evidencia o alegación de defensa propia, de acto hostil de la víctima contra el acusado, y no siendo dudosa o equívoca la evidencia del Fiscal de quién fuera el agresor, ni que las manifestaciones formen parte de la transacción, se sostiene la objeción del Fiscal."

Para sostener su señalamiento, invoca el apelante la jurisprudencia tal como se resume en 30 C. J. 191 y 241, en parte de los párrafos 419 y 477, a saber:

"It has also been held that where the evidence of the killing is wholly circumstantial, threats of deceased even if unknown to defendant are admissible in evidence as tending to show the inherent probabilities of the transaction irrespective of any question of self-defense."

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

"Thus in case the evidence leaves it doubtful as to whether or not deceased was the aggressor in the difficulty in which the killing occured as claimed by defendant, evidence of threats of deceased against defendant, even though not communicated to him, tends to show deceased's animus toward defendant and bears on the probability of his having been the aggressor, and hence is admissible for this purpose."

Pero en el propio párrafo 419 de la página 191 del tomo 30 de Corpus Juris, se resume antes la regla general y otras de las excepciones, así:

"De ordinario en ausencia de actos tendentes a realizar el delito, las amenazas por parte del occiso contra el acusado, o las amenazas de naturaleza ·general son inadmisibles. Mas las amenazas hechas por el interfecto contra el acusado son admisibles como parte del *res gestae* cuando fueron hechas al tiempo de realizarse el acto que ellas se suponen caracterizar y que armonizan con éste en tal forma que constituyen una transacción, siempre que tales amenazas se refieran al acusado. Es inmaterial si las amenazas fueron comunicadas al acusado o si ellas fueron hechas en serio o no, o si el occiso hizo aquello que justificó en el acusado la razonable creencia de que el finado tenía la intención de llevar a cabo las amenazas. Tales amenazas también sirven de explicación al dicho del acusado, según demuestra la acusación, de que él tendría que dar muerte al interfecto."

Y antes de lo citado por el apelante se dice en el párrafo 477 de la página 241 del tomo 30 de Corpus Juris:

"Se ha establecido como regla general que las amenazas hechas por un interfecto contra el acusado no son admisibles como prueba a menos que ellas fueran comunicadas al acusado antes de la muerte, mas existen importantes modificaciones a esta regla."

Y después:

". . . y prueba de amenazas no comunicadas también es admisible al ser acompañada por prueba de amenazas que han sido comunicadas al acusado, toda vez que tal prueba corrobora las amenazas comunicadas y tiende a establecer la realidad del peligro en que el acusado se creía estar al momento de dar muerte a la víctima. Prueba de amenazas no comunicadas hechas por el interfecto poco antes de su muerte, en unión de actos y de conducta que indiquen la intención de llevar a cabo las amenazas, puede ser admisible como parte del *res gestae*. Aunque se ha dicho en términos generales que al presentarse la acusación de defensa propia las amenazas hechas por el interfecto son admisibles, ora hubiesen sido comunicadas o no, otras autoridades sostienen que son inadmisibles al no ser pertinentes a los fines u bajo las condiciones que acabamos de enunciar."

Aplicando esa jurisprudencia a los hechos de este caso se concluye que la regla general es la aplicable porque los

hechos no demuestran la existencia de ninguna de las excepciones y por tanto que no erró la corte al negar la práctica de la evidencia que propuso el acusado.

Cuando el incidente ocurrió ya se había practicado la prueba de cargo, que, tal como la resume el juez sentenciador en sus instrucciones al jurado, es como sigue:

"El Fiscal estima que se trata de un caso de asesinato en segundo grado y la evidencia presentada por él, que consiste en las declaraciones del Dr. Blas C. Herrero, Dr. Manuel López del Valle, José Díaz González, Ramón Estrada, Nemesio Guardiola, Juan Hernández Jr., y Juan R. Molina, ha tendido a demostrar que allá en la noche del 15 al 16 de marzo del 1930, en Toa Alta, P. R., estando el hoy interfecto Antonio Vázquez Mojica, P. I., de servicio en una de las calles de dicho pueblo, el Sargento Joaquín Morales Orama (el acusado) que era su Jefe inmediato, se acercó al guardia, éste le saludó, y le dijo: 'sin novedad'; que el sargento Morales dijo al policía Vázquez: 'véngase conmigo' y ambos siguieron por la calle de la carretera hacia Corozal, por donde está el cementerio; que pocos momentos después se oyeron dos disparos y las palabras 'Titilo, Titilo, que me matan, bendito sea Dios', viéndose cuando el guardia iba corriendo como hacia el cementerio, con las manos levantadas, y el sargento Morales que le hacía cuatro disparos; que el guardia se desplomó y cayó al suelo, estando vestido con guerrera y un sobretodo de invierno, y teniendo la macana colgada en la mano derecha; que entonces el sargento le levantó el capote y la guerrera al policía, le sacó un revólver y con él hizo cuatro disparos más hacia donde estaba el cuerpo del policía; que Nemesio Guardiola (Titilo) que había salido de su casa desnudo cuando los dos primeros disparos, le dijo al sargento que no le tirara más y que vió cuando éste colocó el revólver en el suelo, cerca de la mano derecha del guardia, pero luego lo recogió y se lo echó al bolsillo, diciéndole el sargento a Guardiola que tenía que ir a declarar porque él lo salvaba; que Juan Hernández Jr., que sintió también los disparos y se dirigió al sitio, dice que gritó al sargento que no fuera cobarde, que no lo matara en el suelo, y que atendió al policía, a quien le oyó quejar, y lo levantó, colocándolo en uno de sus muslos; que allí el acusado admitió que él había matado al policía; que entonces éste fué llevado en un automóvil, donde iba también el sargento, para el hospital, deteniéndose frente a la casa del Dr. Manuel López del Valle, quien se había levantado al oír los disparos, manifestando dicho Dr. que el policía

estaba ya muerto, lo que pudo comprobar luego en el hospital y que presentaba seis heridas de bala; que el acusado entregó a Juan R. Molina dos revólveres, uno que tenía seis balas disparadas, que dijo que era el suyo y otro que tenía cuatro balas disparadas, que expresó era el del policía; que éste tenía puesta una guerrera y el sobretodo abrochado, que se lo quitaron en la mesa de. operaciones del hospital, no encontrando el Dr. López del Valle que el interfecto tuviera en las manos olor a pólvora; que el acusado le dijo que lo examinara, que lo examinó, y no tenía ninguna lesión; que al día siguiente, como a las nueve de la mañana, el Dr. Blas C. Herrero practicó la autopsia del cadáver del policía Vázquez Mojica y encontró que tenía en la espalda dos orificios de entrada de bala y dos de salida, en los sitios que él mostró, siendo esas heridas leves, y que presentaba además dos heridas de bala en el pecho, mortales por necesidad, sin orificios de salida, que lesionaron distintos órganos vitales del cuerpo, tales como los pulmones, el corazón, la aorta, el esófago, el hígado, el bazo, y que le ocasionaron la muerte por hemorragia interna.''

El quinto señalamiento es que ''la corte erró al negarse a admitir en evidencia cierta documentación del Cuartel General de la Policía relativa al interfecto, tendiente a demostrar el móvil que pudo haber tenido el interfecto para atacar al acusado.''

Lo que se trató de introducir en evidencia fué la investigación que se practicó en el Cuartel General de la Policía Insular sobre ciertos cargos formulados por el acusado al interfecto por abandono de servicio y desobediencia de órdenes.

La no admisión se imponía. Se trataba de declaraciones y documentos de un caso distinto al que se investigaba. El Pueblo tenía derecho a repreguntar a los testigos y si la investigación era admitida se le privaba de ese derecho.

Quizá sea conveniente agregar con respecto a éste y al anterior señalamiento, que no obstante las negativas de la corte, fué al jurado evidencia sobre las amenazas.

A la página 135 de la transcripción encuéntrase que el testigo Eugenio Santoni, declaró:

''Que otro día cuando él salía de su oficina se encontró con el

guardia y que sin recordar la fecha sabe que fué como tres o cuatro días antes de leer en El Imparcial las noticias del suceso, habiendo hablado en esa ocasión con el guardia Vázquez, manifestándole éste que el sargento le había formulado unos cargos, que se verían aquel día y que de acuerdo con los cargos, él iba a perder su destino, y que su familia se quedaría sin pan, pero que bien poco más comería el sargento, porque si él salía mal y era necesario, estaba dispuesto a matarlo. Manifestó también que esas noticias no las comunicó al sargento porque no lo vió más.''

A la 137 que el testigo Mariano Velilla, dijo:

''. . . que el guardia Vázquez habló con el testigo, ese día y en distintas ocasiones; que le dijo que si salía mal de los cargos, mataba al sargento.''

Y a la página 139 que el testigo Secundino Díaz, manifestó:

''. . . que conoce a Joaquín Morales Orama y conoció al guardia Antonio Vázquez Mojica y que para el 15 de marzo del año pasado, 1930, desempeñaba el cargo de Alcalde de Toa Alta, y estaba ese día en el pueblo, recordando haber hablado la noche antes a la del 15 de marzo con el guardia Vázquez Mojica, mientras él prestaba servicio esa noche, y que la conversación que tuvo con el guardia, fué la siguiente: Que mientras él se retiraba a dormir cuando pasó cerca del policía, éste lo llamó y le dijo, 'he visto al sargento cruzar por la calle, y si esta noche me viene a revistar le voy a entrar a tiros'; que él tenía un capote y dentro del capote le mostró el revólver; que eso se lo dijo la noche antes de haber muerto el guardia.''

Existen otras constancias.

Por el sexto señalamiento se imputa pasión, prejuicio y parcialidad a la corte durante el curso del juicio. No existe. Al acusado se reconocieron todos los derechos que la ley le otorga y que sus hábiles abogados invocaron hasta el límite. No puede quejarse en verdad. Tanto el veredicto del jurado—homicidio en vez de asesinato—como la pena que el juez le impuso—cinco años de presidio pudiendo imponerle diez—le fueron favorables.

■ El último señalamiento alega error en la instrucción

de la corte sobre duda razonable. No existe. La instrucción impugnada es como sigue:

"La culpabilidad del acusado debe probarse a satisfacción del jurado, fuera de duda razonable, y en caso de que exista duda razonable se le debe absolver.

"Existe duda razonable cuando después de un cuidadoso examen, estudio y comparación de toda prueba, queda el ánimo del jurado en tal situación de embarazo que no puede decir si tiene una firme convicción o certeza moral respecto a la verdad de la acusación que se formula contra el acusado. Esto no significa que deba destruirse toda duda posible, ni que la culpabilidad del acusado deba demostrarse como una certeza matemática, sino que la evidencia debe producir aquella certeza moral que convence y dirige la inteligencia y satisface la razón. No debe ser, pues, una duda especulativa o imaginaria. La duda que justifica la absolución no sólo debe ser razonable, sino que debe surgir de una serena e imparcial consideración de toda la evidencia del caso, o de la falta de suficiente prueba en apoyo de la acusación.

"En los casos criminales, la ley presume que el acusado es inocente mientras no se pruebe lo contrario, de modo satisfactorio, y por evidencia competente, y es regla de ley que su culpabilidad debe ser completamente probada. Esta presunción de inocencia acompaña al acusado durante el juicio, y el jurado debe tenerla presente al deliberar."

*Debe confirmarse la sentencia recurrida.*