EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* JOSÉ A. DE JESÚS SANTANA, acusado y apelante.

*Número:* CR-71-110     *Resuelto:* 13 de septiembre de 1972

*Nicolás Torres Marrero* y *Manuel García Marrero*, abogados del apelante; *Gilberto Gierbolini, Procurador General,* y *Bienve-*

*nido Vélez Coello, Procurador General Auxiliar,* abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR MARTÍN emitió la opinión del Tribunal.

El apelante José Antonio de Jesús Santana fue acusado conjuntamente con su hermano Roberto de Jesús Santana por el delito de asesinato en primer grado por haber dado muerte al ser humano Sixto Torres Declet, y por infracciones a los Arts. 6 y 8 de la Ley de Armas. Roberto fue absuelto perentoriamente. El apelante fue encontrado culpable del delito de homicidio voluntario por tribunal de derecho y por las citadas infracciones a la Ley de Armas. Fue sentenciado a cumplir de 2 a 8 años por el delito de homicidio voluntario, y concurrentemente con dicha pena: de 1 a 3 años por la infracción al Art. 8 de la Ley de Armas y 6 meses por la infracción al Art. 6 de dicha ley. No conforme con el fallo y sentencia dictada en el caso de homicidio voluntario, el acusado ha interpuesto recurso de apelación ante nos.

Se señala como único error que incidió el tribunal sentenciador al declarar culpable de homicidio voluntario al apelante en ausencia de prueba suficiente que justifique el fallo emitido. Como parte del error se señala que la defensa probó un caso de defensa propia.

Para la disposición de este señalamiento es indispensable que hagamos un recuento de la prueba ofrecida.

El testigo José Colón Rivera testificó, en lo que es pertinente, que era el dueño del negocio donde ocurrieron los hechos; que el día 4 de diciembre de 1967 alrededor de las 12:30 del mediodía se encontraban varias personas almorzando en su negocio situado en una zona rural, mientras otras que ya habían almorzado jugaban billar; que vio a don Vive, padre del apelante, en la parte de afuera del negocio; que oyó un "escarceo" fuera del negocio y observó al padre del apelante, a través de la puerta que da al frente del negocio, moviéndose de un lado para otro; que simultáneamente se escucharon tres detonaciones que provenían del

exterior del negocio; que acto seguido vio, desde el interior del negocio, a la víctima Sixto Torres entrar corriendo por la puerta izquierda del negocio y luego salir por la puerta derecha, volviendo a entrar por la izquierda, y desplomándose entonces en el piso a la entrada de dicha puerta izquierda; que detrás de la víctima, mientras ésta corría, iba el apelante con "una cosa negra" como de cuatro pulgadas y cuarto; que no pudo determinar si era un revólver; que varias personas recogieron a la víctima y la llevaron al hospital en un automóvil; que al irse el herido encontró una cuchilla manchada de sangre en el fondo de una silla que estaba cerca de donde pasó la víctima corriendo dentro del establecimiento; que luego pudo recordar que dicha cuchilla era de la víctima ya que lo había visto en una ocasión anterior mondando una china; y que con posterioridad al incidente narrado vio que Don Vive tenía una herida en la parte derecha del cuello y otra en la cabeza y que brotaba sangre de dichas heridas.

El testigo Adelaido Vázquez testificó, en lo que es pertinente, que la tarde de los hechos, como a las doce y quince estaba jugando en una mesa de billar cuando sonaron como cuatro disparos; que todo el mundo corrió y él no sabía qué hacer; que vio cuando la víctima entró corriendo al establecimiento; que éste arrastró las sillas y la mesa donde había gente comiendo; que salió por la otra puerta, y que al entrar de nuevo por la puerta izquierda se desplomó; que al desplomarse la víctima se le acercó, le alzó la camisa y vio un plomo que le salía del estómago; y que en ese momento vio al apelante con una pistola en la mano tratando de meterle o sacarle un *clip* de balas.

El policía Roberto Feliciano declaró en lo que es pertinente: que conocía a los acusados desde que eran niños; que el día de los hechos vio a los acusados en su casa, que éstos vinieron a procurar al padre de Feliciano quien estaba ausente; que allí notó que el padre de los acusados tenía una herida en el cuello pero que no se fijó bien cómo era y que

no botaba mucha sangre; que luego salió con los hermanos acusados y al pasar frente al negocio de José Colón vieron a un grupo de personas, contándole entonces el apelante lo que había sucedido; que los llevó al cuartel y regresó con el juez al lugar de los hechos en donde encontró unos casquillos que entregó al juez; y que allí observó que el padre de los acusados mostraba algo en la cabeza como un rayacito o un pequeño chichón.

El Dr. José Antonio Caro declaró haber practicado la autopsia al occiso. Expresó que en su opinión la muerte fue producida por una hemorragia causada por dos heridas de proyectil—una en el abdomen y otra en el brazo. Identificó un proyectil calibre 22 que extrajo del estómago del occiso.

Ángel de Jesús, conocido por Don Vive, padre de los acusados declaró, en lo que es pertinente: que el día de los hechos cuando ya se iba del negocio de José Colón se encontró con la víctima; que hablaron en relación con un incidente ocurrido la noche anterior en que el testigo había intervenido en una discusión entre la víctima y una persona llamada Luis Sánchez; que acto seguido la víctima insultó de palabras al testigo y le atacó con una cuchilla tirándole "unos cuantos tajos", que se sintió herido y escuchó unos disparos; que fue herido en el cuello y en la cabeza, con motivo de lo cual le cogieron dos puntos. Identificó la cuchilla presentada en evidencia como la que tenía la víctima en la mano y con la cual le agredió. Dijo además no saber quién hizo los disparos.

El propio apelante José Antonio de Jesús Santana declaró: que el día de los hechos se encontraba fuera del negocio de José Colón hablando con unos amigos; que conocía a la víctima por ser ambos vecinos del mismo barrio; que vio a la víctima llegar al negocio y oyó cuando su padre le dijo a la víctima que el incidente de la noche anterior no tenía ningún sentido. Declaró además que la víctima le dijo unas palabras a su padre y le tiró con una cuchilla unas ocho o diez veces; que al ver a su padre herido y siendo la víctima

un hombre peligrosísimo le disparó; que sabía de su peligrosidad porque había mutilado en una ocasión a un veterano. (¹) A preguntas del juez declaró no recordar el tiempo que hacía que tenía la pistola, ni cómo llegó a sus manos. Dijo, sin embargo, que ese día la tenía encima porque venía de la finca a donde la llevaba siempre.

En adición a la prueba testifical antes reseñada, el fiscal presentó una deposición tomada ante el juez al hermano de la víctima en la cual el deponente, quien se encontraba en Estados Unidos a la fecha del juicio, señala que el co-acusado Roberto de Jesús había disparado con otra pistola. El juez sentenciador no dio crédito a la misma por ser contradictoria e increíble y así lo expresó en corte abierta al absolver a dicho co-acusado Roberto de Jesús. Un examen de dicha deposición nos confirma que la apreciación del juez de instancia es correcta.

El apelante aceptó en su testimonio que él hizo los disparos que causaron la muerte a la víctima. La única cuestión sustancial pues que plantea el recurso ante nos es si el apelante al matar a la víctima actuó en defensa de un semejante. De haber sido así el homicidio puede ser justificable conforme a lo dispuesto en el Art. 209 del Código Penal (33 L.P.R.A. sec. 641),² y más específicamente si al así actuar

---

(¹) La defensa presentó en evidencia los expedientes de dos convicciones contra la víctima por una infracción al Art. 4 de la Ley de Armas y por el delito de mutilación, respectivamente.

(²) El Art. 209 dispone:

"Podrá también justificarse el homicidio cuando lo cometiere alguna persona en cualquiera de los casos siguientes:

"1. En el acto de resistir o impedir la tentativa de asesinar o de inferir grave daño corporal a alguna persona, o de cometer algún delito grave.

"2. Cuando se comete al defender una morada, propiedad o persona contra alguno que manifiestamente intente o procure, por medio de violencia o sorpresa, cometer cualquier delito grave o que violenta, desordenada y tumultuosamente intente o procure penetrar en la morada de otro con el propósito de agredir a alguna persona que se hallare en ella.

"3. Cuando se comete en legítima defensa de dicha persona, o de la

estuvo justificado en matar al agresor de su padre en evitación de que aquél le causara grave daño corporal a éste.

▮ Se ha sostenido que una persona puede utilizar violencia en defensa de un semejante sólo cuando la persona en peligro hubiese estado justificada en usarla en su propia defensa. *Pueblo* v. *Knight*, 72 D.P.R. 111, 116 (1951). Asimismo la justificación de un homicidio en defensa de un tercero depende de las mismas condiciones que excusarían al tercero bajo una alegación de defensa propia. 1 Wharton *Criminal Law and Procedure*, sec. 219; *State* v. *Hennessy*, 90 Pac. 221; *White* v. *Commonwealth*, 333 S.W.2d 521; *People* v. *Forte*, 110 N.E. 47. Por tal razón los principios de defensa propia son igualmente aplicables a los casos de homicidio en defensa de un semejante. *People* v. *Roe*, 189 Cal. 548; *People* v. *Ortiz*, 63 Cal. App. 662; véase Fricke and Alarcon, *California Criminal Law*, 10th Ed. pág. 180.

▮ Para que un acusado pueda alegar con éxito la teoría de defensa propia deberá demostrar que tenía motivos fundados para creer que estaba en inminente peligro de perder la vida o de recibir grave daño corporal y que no infligió más daño que el necesario para la defensa de su vida. *Pueblo* v. *Ríos Rivera*, 88 D.P.R. 165 (1963); *Pueblo* v. *Lozada*, 37 D.P.R. 927 (1928). El que mata, sin embargo, debe haber empleado todos los medios a su alcance, consistentes con su propia seguridad, para evitar que se le ocasionen daños o tener que privar de la vida a otra persona al

esposa o esposo, padre o madre, hijo, amo, o sirviente de tal persona, siempre que hubiere motivos fundados para sospechar que existe el propósito de cometer un delito grave, o de inferir grave daño corporal, e inminente riesgo de que tal propósito se realice; pero dicha persona, o la persona cuya defensa se intentare, si fuere el agresor, o estuviere empeñada en lucha mortal, deberá tratar de desistir de ella, antes de cometerse el homicidio.

"4. Cuando hubiere necesidad de cometerlo, al intentar por medios legítimos, la prisión de algún reo de delito grave, o al procurar legalmente mantener el orden público."

defenderse. *Pueblo* v. *Román Marrero*, 96 D.P.R. 796, 802 (1968).

Es imprescindible, además, que las circunstancias que concurran para justificar la defensa propia deben ser suficientes para excitar el temor de una persona razonable. *Pueblo* v. *Morales*, 45 D.P.R. 191 (1933); *Pueblo* v. *Ríos Rivera*, supra. Es por ello que cobra importancia la función del juzgador en estos casos en la determinación de si una persona razonable en la posición del acusado, sabiendo lo que sabía y viendo lo que vio, crea necesario el ultimar al agresor para evitar el daño. *People* v. *Head*, 288 Pac. 106. Más aún, es regla de la defensa propia el que no es necesario que el agredido venga obligado a retroceder hasta colocarse en una posición de indefensión (*retreat to the wall*) antes de atacar a su agresor conforme se sostenía en el antiguo derecho común. *Pueblo* v. *Iturrino de Jesús*, 90 D.P.R. 706 (1964); *Pueblo* v. *Díaz Alicea*, 91 D.P.R. 786 (1965). Inclusive, el agredido, además de lograr su defensa, puede perseguir al atacante si ese curso de acción es indispensable para salvar su vida. *People* v. *Rinowacki*, 39 Cal. App.2d 376; *People* v. *Campanella*, 39 Cal. App.2d 384; *People* v. *Hatchett*, 56 Cal. App.2d 20.

En California, donde las disposiciones del Código Penal sobre defensa propia son similares a las nuestras se ha resuelto que puede darse muerte a un atacante si el atacado es colocado en una situación en que una persona razonable pudiere sentirse en peligro inminente de que otro habrá de causarle grave daño corporal. *People* v. *Mercer*, 210 Cal. App.2d 153; *People* v. *Ranson*, 119 Cal. App.2d 380. Cuando el peligro es repentino, y sobre todo inminente, y la necesidad de acción es inmediata, si bien la conducta del acusado ha de ser la de una persona razonable, dicha conducta no puede ser pesada en balanzas muy sofisticadas (*too nice scales*), *People* v. *Mercer*, supra; *People* v. *Collins*, 189 Cal. App.2d

575; *People* v. *Hecker*, 109 Cal. 451, 42 Pac. 307. Naturalmente, si el peligro cesa, la agresión no se justifica, *Pueblo* v. *Ríos Rivera*, supra; *Pueblo* v. *Lozada*, supra; empero mientras el peligro subsista el agredido puede atacar al agresor con el fin de lograr su seguridad. *People* v. *Rinowacki*, supra; *People* v. *Campanella*, supra.

Con estas normas como base veamos las circunstancias del caso que nos ocupa. Estamos frente a una situación singular en que sólo los testigos de defensa, a saber, el acusado y su padre, pueden dar una versión exacta de lo acontecido fuera del negocio. Los otros testigos que declararon sobre el incidente estaban dentro del negocio, y su observación de lo que en efecto ocurrió fuera del establecimiento fue limitada en extremo. La versión que surge de la prueba de defensa fue al efecto de que la víctima, quien alegadamente era un hombre peligroso, atacó al padre del acusado con una navaja, hiriéndolo en la cabeza y en el cuello. Al ver a su padre herido, y mientras la víctima continuaba agrediendo a aquél con una navaja, el acusado le disparó tres o cuatro veces en forma rápida y sucesiva. No hay evidencia alguna de que los disparos ocurrieran mientras la víctima estuviere huyendo, y por el contrario, la prueba es al efecto de que el apelante no disparó durante la huida de aquél.

La versión del apelante no es ilógica, ni contradictoria, ni fue refutada en ningún aspecto. Más aún, de la propia prueba de El Pueblo surgen elementos que corroboran en parte la misma. El "escarceo" que el dueño del negocio escuchó momentos antes de los disparos fuera del negocio y el haber visto desde el interior del negocio (desde donde su campo visual estaba limitado a lo que podía ver a través de dos puertas exteriores del establecimiento) al padre del acusado moviéndose de un lado a otro, y el haber observado unos instantes después de los hechos al padre del acusado con unas heridas, y el haber encontrado la navaja de la víctima ensangrentada sobre una silla que estaba en el trayecto por donde

pasó corriendo la víctima, no obstante el no haber visto a éste atacar al padre del acusado, son circunstancias que debió considerar el tribunal al dilucidar la prueba y las que ciertamente corroboran los testimonios de la defensa.

La prueba de la defensa, que no fue impugnada ni controvertida por la del Pueblo, revela la forma en que se desarrollaron los acontecimientos y nos da pie para concluir que el apelante actuó movido por el temor de una persona razonable que se enfrenta al peligro inminente que su padre corría al ser sometido a un ataque súbito, peligroso y constante con un arma cortante que iba evidentemente dirigida hacia el cuello y la cabeza y que como cuestión de hecho fue alcanzado y herido por el agresor. Lógicamente tal situación hizo temer al apelante que la agresión ininterrumpida de parte de la víctima pudiere privar de la vida a su padre sin que mediara tiempo para evitarlo. Agravaba aún más la aprehensión del apelante el conocimiento que él tenía del mal carácter y peligrosidad de la víctima. (³) En tales circunstancias y sucediéndose la acción en tan cortos instantes en que un titubeo podía resultar en una desgracia, puede encontrarse justificación en la actuación defensiva de un hijo, que al presenciar los hechos y sentirse incapaz de acudir efectivamente a otros medios, venga obligado a utilizar el último recurso que le estaba entonces disponible para poner fin a una peligrosa situación.

En el caso de autos la persecución de la víctima por el apelante luego de los disparos realmente no tuvo consecuencias, ya que surge de la prueba que el apelante no hizo disparos adicionales mientras perseguía a la víctima.

---

(³) La prueba en cuanto al mal carácter y peligrosidad de la víctima es admisible en un caso en que se alega defensa propia tanto para establecer la razonabilidad del temor surgídole al apelante en el momento del homicidio, como para corroborar la prueba sobre la conducta de la víctima que motivó el homicidio. *Morales Torres* v. *Tribunal Superior*, 99 D.P.R. 459 (1970).

Nuestra Regla 157 de Procedimiento Criminal dispone que el acusado tiene la obligación de probar las circunstancias mediatorias que excusen o justifiquen el hecho de la muerte, una vez se prueba que él causó la muerte. Sin embargo, dicha Regla no puede afectar la presunción de inocencia del acusado aun probada la muerte ilegal, por lo que no impone ésta la obligación de establecer con prueba preponderante los elementos justificantes o eximentes del delito. La única prueba requerida del acusado es aquella que levante una duda razonable de su culpabilidad. Tal interpretación está permeada por la disposición constitucional que establece la presunción de inocencia cuya presunción acompaña al acusado a través de todo el proceso criminal. Constitución de Puerto Rico, Art. II, sec. 11.

En *Pueblo* v. *Túa*, 84 D.P.R. 39, 53 (1961), aunque se trataba de un caso de asesinato en el que no se alegaba la justificación del mismo tuvimos la oportunidad de interpretar el Art. 247 del Código de Enjuiciamiento Criminal, hoy Regla 157 de Procedimiento Criminal, con relación al grado de prueba que debe presentar el acusado para probar que han mediado circunstancias atenuantes o que excusen o justifiquen el hecho de la muerte. Resolvimos allí que: ". . . al acusado le acompaña la presunción de inocencia en cuanto a todo elemento esencial del delito y no cambia el peso de la prueba en etapa alguna del proceso." En su consecuencia dijimos que el acusado "Sólo vendría obligado a producir aquella prueba que establezca una duda razonable sobre su culpabilidad."

En el caso ante nos, si bien es cierto que han quedado algunas circunstancias oscuras en cuanto a la justificación, entendemos que la prueba de defensa estableció una duda razonable en cuanto a la existencia de elementos justificantes del delito. La versión de los hechos presentada por la defensa, que no fue refutada por la prueba de El Pueblo, sino por el contrario fue corroborada en parte por ésta, unida

a que sólo los testigos de defensa pudieron dar una versión lógica de lo acontecido, nos mueve a concluir que existe una duda razonable sobre la culpabilidad del acusado en cuanto al homicidio. Dicha duda debe ser resuelta a su favor.

*Se revocará la sentencia apelada en este caso por el delito de homicidio voluntario.*

El Señor Juez Presidente, Luis Negrón Fernández, no intervino. El Juez Asociado, Señor Martínez Muñoz, disintió.