EL PUEBLO DE PUERTO RICO, demandante y recurrido, *v.* MARINA GONZÁLEZ ROMÁN, acusada y peticionaria.

*Número:* CE-91-865　　　*Resuelto:* 4 de febrero de 1992

*Fleming Castillo Alfaro*, abogado de la peticionaria; *Reina Colón de Rodríguez, Subprocuradora General,* y *Eunice*

*Amaro Garay, Procuradora General Auxiliar*, abogadas de El Pueblo.

EL JUEZ ASOCIADO SEÑOR REBOLLO LÓPEZ emitió la opinión del Tribunal.

Revisamos, mediante el mecanismo procesal de la orden de mostrar causa, la resolución que con fecha de 6 de diciembre de 1991 emitiera el Tribunal Superior de Puerto Rico, Sala de Caguas;[1] resolución mediante la cual dicho foro judicial no le permitió a la representación legal de la peticionaria Marina González Román presentar una testigo —perito "en asuntos de violencia doméstica" (*Exhibit* I, pág. 1)— en el proceso que por los delitos de homicidio e infracción al Art. 4 de la Ley de Armas de Puerto Rico, 25 L.P.R.A. sec. 414, actualmente se celebra, ante Jurado, en dicho tribunal contra la referida peticionaria.

## I

Conforme surge de la relación de los hechos que consta en la solicitud de *certiorari* radicada, la cual no ha sido contradicha por la Oficina del Procurador General de Puerto Rico, la evidencia testifical que presentara el Ministerio Fiscal durante su turno de presentación de prueba consistió del testimonio de los testigos Diego Figueroa Torres,[2] Antonio Rivera Martínez,[3] Elsie E. Colón Ortiz,[4] Adalberto Reyes Flores,[5] José Rivera,[6] y el Dr. Francisco Cortés Rodríguez[7].

A los fines de la correcta solución del presente recurso, resulta de singular pertinencia lo declarado por los testigos

---

[1] Hon. Luis V. Castro, Juez Superior.

[2] Agente de la Policía de Puerto Rico que originalmente investigó la querella.

[3] El señor padre del occiso Jorge Rivera Alejandro.

[4] Vecina del sector donde ocurrieron los hechos.

[5] Igualmente, vecino del sector.

[6] El primer agente de la Policía de Puerto Rico que llegó al lugar de los hechos.

[7] El patólogo forense que efectuó la autopsia en el cadáver del occiso.

Figueroa Torres, Rivera Martínez y el patólogo forense Cortés Rodríguez. El agente Figueroa Torres declaró, en lo pertinente, que recibió el día 10 de diciembre de 1990 instrucciones de sus superiores para que investigara una muerte violenta ocurrida en el Sector "Salchichón" de Caguas, Puerto Rico. Luego de arrivar a la escena de los hechos y haberse entrevistado preliminarmente con el agente Rivera y el padre del occiso, entrevistó a la aquí peticionaria González Román. Declaró que, luego de que él le hiciera a ésta las advertencias que la ley y la jurisprudencia exigen se le hagan a todo sospechoso de la comisión de un delito y de cerciorarse que la referida dama había entendido las mismas,[8] la peticionaria González Román le informó que

> ...el día antes ella lo había pasado en una fiesta de bautismo y llegó a su casa alrededor de la medianoche y se acostó. Luego[,] como a las cuatro de la madrugada llegó su esposo borracho [el occiso, Jorge Rivera Alejandro] y comenzó a golpear la puerta de su cuarto con un martillo para que abriera. Al ella abrir la puerta[,] lo vio con un martillo en una mano y un cuchillo en otra; lanzó el martillo hacia un lado *y se le abalanzó con el cuchillo en mano agarrándola por el cuello. Comenzaron a forcejear y él resultó herido,* salió del cuarto, se fue al balcón[,] luego a la cocina, ella se quedó dormida. (Énfasis suplido.) Petición de *certiorari,* pág. 3.

El testigo Antonio Rivera Martínez, padre del occiso, declaró, en lo pertinente, que

> ...el día de los hechos oyó a Marina gritando, llorando que le habían matado al esposo. Cuando la policía llegó, *él les informó que tenía que haber sido Marina ....* Añadió que Marina y su hijo llevaban diez años juntos, *peleaban mucho por lo mucho que bebía su hijo.*
> A preguntas de la defensa[,] declaró que *Marina en varias ocasiones llegó a su casa con los ojos hinchados de los golpes*

---

[8] Procede que se señale que el tribunal de instancia, antes de admitir la referida declaración y en ausencia del Jurado, celebró una vista al amparo de la Regla 9 de Evidencia, 32 L.P.R.A. Ap. IV.

*recibidos de su hijo;* que él le decía que acudiera a la policía, pero ella no iba. (Énfasis suplido.) Petición de *certiorari*, págs. 3–4.

El patólogo forense que practicó la autopsia en el cadáver del occiso, doctor Cortés Rodríguez, testificó, en lo pertinente, que

... la herida era de una trayectoria *de abajo hacia arriba, de frente al lado del ombligo, que podría ser compatible como producto de un forcejeo.* El examen toxicológico arrojó una cifra *de 31% de alcohol en la sangre* .... (Énfasis suplido.) Petición de *certiorari*, pág. 5.

Sometido el caso por el Ministerio Público, la defensa presentó, como primer testigo, a un hermano de la acusada, de nombre Ángel González Román. Éste, en lo pertinente, "corroboró" lo atestiguado por el padre del occiso "en relación con *las múltiples ocasiones en que vio a su hermana agolpeada,* con moretones en varias partes de su cuerpo". (Énfasis suplido.) Petición de *certiorari*, pág. 5.

Como segundo testigo de defensa, se llamó a la testigo Úrsula Colón. El foro de instancia ordenó retirar de Sala a los señores del Jurado. Al ser cuestionada por el magistrado que presidía los procedimientos, la defensa manifestó que el testimonio de esta testigo "se ofrecía como testimonio pericial *sobre el síndrome de mujer maltratada* como parte de su teoría de defensa propia". (Énfasis suplido.) Petición de *certiorari*, pág. 5.

Como informáramos al comienzo, el tribunal de instancia se negó a permitir que dicha testigo declarara. En la resolución que a esos efectos emitiera, el foro de instancia expresó que no permitía dicho testimonio, el cual se presentaba por la defensa "para reforzar la alegada defensa propia *por no haberse ofrecido prueba de clase alguna que siquiera insin[ú]e tal defensa propia*". (Énfasis suplido.) *Exhibit* I, pág. 1.

Inconforme, acudió ante este Tribunal, vía *certiorari*, la

peticionaria González Román. El 3 de enero de 1992 emitimos la orden de mostrar causa siguiente:

> Vista la petición de [certiorari], memorando y documentos anejos, se concede hasta el viernes 10 de enero de 1992, a las cinco de la tarde, para que comparezca por escrito el Procurador General a mostrar causa, si la hubiere, por la cual no deba expedirse el auto solicitado y dictarse Sentencia revocatoria de la Resolución recurrida.
>
> En auxilio de jurisdicción, se paralizan los procedimientos a nivel de instancia, hasta que otra cosa disponga el Tribunal.
>
> La presente Resolución deberá ser notificada a las partes y al tribunal de instancia por la vía telefónica y ordinaria.
>
> Lo acordó el Tribunal y certifica el señor Secretario General. El Juez Presidente [S]eñor Pons Núñez y los Jueces Asociados [S]eñora Naveira de Rodón y [S]eñor Hernández Denton no intervinieron. Resolución de 3 de enero de 1992.

En la comparecencia que radicara en cumplimiento de la referida orden, la Procuradora General sostiene —al igual que el tribunal de instancia— que el testimonio objetado no es admisible en evidencia "por no haberse probado los elementos de hechos necesarios para establecer una legítima defensa". Escrito para mostrar causa, pág. 5. *Diferimos*. Veamos por qué.([9])

## II

■ El Art. 22 del vigente Código Penal de Puerto Rico, 33 L.P.R.A. sec. 3095 —situado el mismo en el Subcapítulo V del referido código, subcapítulo que trata sobre las "Causas de Exclusión de Responsabilidad"— establece:

> *No incurre en responsabilidad el que defiende su persona*, sus bienes o derechos, o su morada, o la persona, bienes o derechos,

---

([9]) En justicia, procede que se enfatice que son de excelente calidad jurídica tanto la solicitud de *certiorari* radicada por la representación legal de la peticionaria González Román como la comparecencia de la Procuradora General de Puerto Rico. Hemos adoptado, y hecho nuestro, varios de los señalamientos y razonamientos que hacen las partes en sus respectivos escritos.

o morada de otros *en circunstancias que hicieren creer razonablemente que se ha de sufrir un daño inminente, siempre que hubiere necesidad racional del medio empleado para impedir o repeler el daño, falta de provocación suficiente del que ejerce la defensa, y no se inflija más daño que el necesario al objeto.*

Para justificar el dar muerte a un ser humano, cuando se alegue legítima defensa, *es necesario tener motivos fundados para creer que al dar muerte al agresor se hallaba el agredido o la persona defendida en inminente o inmediato peligro de muerte o de grave daño corporal.*

Para justificar la defensa de bienes o derechos las circunstancias indicarán un ataque a los mismos que constituya delito o los ponga en grave peligro de deterioro o pérdida inminente.

Para justificar la defensa de morada las circunstancias indicarán una penetración ilegal o con el fin de cometer algún delito. (Énfasis suplido.)

 Como podemos claramente notar, se trata de una *defensa afirmativa* que exige la concurrencia de *varios requisitos* que la propia disposición legal enumera. En el caso normativo de *Pueblo v. De Jesús Santana*, 100 D.P.R. 791, 797-799 (1972), se resolvió que:

Para que un acusado pueda alegar con éxito la teoría de defensa propia deberá demostrar que tenía motivos fundados para creer que estaba en inminente peligro de perder la vida o de recibir grave daño corporal y que no infligió más daño que el necesario para la defensa de su vida. *Pueblo v. Ríos Rivera*, 88 D.P.R. 165 (1963); *Pueblo v. Lozada*, 37 D.P.R. 927 (1928). El que mata, sin embargo, debe haber empleado todos los medios a su alcance, consistentes con su propia seguridad, para evitar que se le ocasionen daños o tener que privar de la vida a otra persona al defenderse. *Pueblo v. Román Marrero*, 96 D.P.R. 796, 802 (1968).

Es imprescindible, además, que las circunstancias que concurran para justificar la defensa propia deben ser suficientes para excitar el temor de una persona razonable. *Pueblo v. Morales*, 45 D.P.R. 191 (1933); *Pueblo v. Ríos Rivera*, supra. Es por ello que cobra importancia la función del juzgador en estos casos en la determinación de si una persona razonable en la posición del acusado, sabiendo lo que sabía y viendo lo que vio, crea necesario el ultimar al agresor para evitar el daño. *People v. Head*, 288 Pac. 106. Más aún, es regla de la defensa propia el que no es necesario que el agredido venga obligado a retroceder hasta

colocarse en una posición de indefensión (*retreat to the wall*) antes de atacar a su agresor conforme se sostenía en el antiguo derecho común. *Pueblo* v. *Iturrino de Jesús*, 90 D.P.R. 706 (1964); *Pueblo* v. *Díaz Alicea*, 91 D.P.R. 786 (1965). Inclusive, el agredido, además de lograr su defensa, puede perseguir al atacante si ese curso de acción es indispensable para salvar su vida. *People* v. *Rinowacki*, 39 Cal. App.2d 376; *People* v. *Campanella*, 39 Cal. App.2d 384; *People* v. *Hatchett*, 56 Cal. App.2d 20.

En California, donde las disposiciones del Código Penal sobre defensa propia son similares a las nuestras se ha resuelto que puede darse muerte a un atacante si el atacado es colocado en una situación en que una persona razonable pudiere sentirse en peligro inminente de que otro habrá de causarle grave daño corporal. *People* v. *Mercer*, 210 Cal. App.2d 153; *People* v. *Ranson*, 119 Cal. App.2d 380. Cuando el peligro es repentino, y sobre todo inminente, y la necesidad de acción es inmediata, si bien la conducta del acusado ha de ser la de una persona razonable, dicha conducta no puede ser pesada en balanzas muy sofisticadas (*too nice scales*), *People* v. *Mercer*, supra; *People* v. *Collins*, 189 Cal. App.2d 575; *People* v. *Hecker*, 109 Cal. 451, 42 Pac. 307. Naturalmente, si el peligro cesa, la agresión no se justifica, *Pueblo* v. *Ríos Rivera*, supra; *Pueblo* v. *Lozada*, supra; empero mientras el peligro subsista el agredido puede atacar al agresor con el fin de lograr su seguridad. *People* v. *Rinowacki*, supra; *People* v. *Campanella*, supra.

█ En fecha más reciente, y en lo pertinente, expresamos que:

La alegación de legítima defensa *hay que evaluarla a la luz de dos (2) vertientes diferentes*. En la primera, se alega que la víctima fue el primer agresor y, en ausencia de medios directos con qué demostrarlo, se recurre al uso de prueba de carácter. Frente a dicha evidencia, el juzgador puede hacer la inferencia de que resulta más probable que, conforme al carácter de la víctima, ésta haya sido el primer agresor. El conocimiento previo del acusado sobre el carácter violento de la víctima no es requisito. *En la segunda,* por el contrario, *se busca justificar la conducta del acusado a la luz de su estado mental,* independientemente de que la víctima en efecto haya sido el primer agresor. *En esta situación, el conocimiento previo por parte del acusado del carácter violento de la víctima resulta medular para poder justificar, bajo esta vertiente, la alegación de legítima defensa.* En este caso, los tribunales permiten el uso de

actos específicos. El propósito, sin embargo, no es probar el carácter de la víctima sino el conocimiento previo que el acusado tenía de ésta *y, por ende, la razonabilidad de su conducta conforme al temor que pudo sentir ante la confrontación con la víctima.* (Énfasis suplido.)[10]

■ En relación con el *requisito o criterio objetivo*, que exige el antes transcrito Art. 22 del Código Penal, de si el acusado que alega defensa propia *actuó o no en forma prudente y razonable al quitarle la vida a su víctima,* es que se ha estado invocando en los últimos años el llamado "síndrome de mujer maltratada", vía la presentación de prueba pericial, en casos en que una mujer, supuestamente víctima de maltrato, es acusada de la muerte de su cónyuge o compañero. Dicha prueba pericial alegadamente tiene el propósito de ayudar al juzgador de los hechos a comprender la singular perspectiva —consistente de temor y debilidad de carácter— desde la cual actúa esa víctima de maltrato que es acusada de la muerte de su pareja.

### III

■ Como correctamente señala la Procuradora General en su comparecencia, en años recientes los psicólogos y sociólogos se han dado a la tarea de estudiar con mayor atención los *efectos* que un patrón constante de abuso físico y psicológico puede tener sobre una mujer. *El efecto que ocasiona en la mujer dicho maltrato es lo que se ha denominado como el "síndrome de mujer maltratada".* Dicho síndrome pretende describir una serie de características que resultan comunes en las mujeres que son abusadas, por un período de tiempo prolongado, por su cónyuge o compañero. Una reconocida escritora sobre el tema, la Dra. Lenore Walker, define la "mujer maltratada" como una:

---

[10] *Pueblo v. Martínez Solís,* 128 D.P.R. 135, 156–157 (1991).

... who is repeatedly subjected to any forceful physical or psychological behavior by a man in order to coerce her to do something he wants her to do without concern for her rights. Battered women include wives or women in any form of intimate relationships with men. Furthermore, in order to be classified as a battered woman, the couple must go through the battering cycle at least twice. Any woman may find herself in an abusive relationship with a man once. If it occurs a second time, and she remains in the situation, she is defined as a battered woman.[11]

En relación con las situaciones en que las acusadas, objeto de ese continuo maltrato de parte de la víctima, han alegado defensa propia y han pretendido presentar en evidencia, en apoyo de dicha defensa, testimonio pericial sobre el mencionado síndrome, se ha dicho que:

It is now well-established that homicide or assault cases involving battered women who killed their assailants pose serious problems to traditional self-defense. Women's self-defense work, beginning with *State v. Wanrow*, 559 P.2d 548 (1977), has developed the perspective that self-defense requirement of reasonableness, imminent danger and equal force are sexbiased. A woman who kills her husband is viewed as inherently unreasonable because she is violating the norm of appropriate behaviour of women. A battered woman who kills her batterer has to overcome special myths and misconceptions about battered women. She must particularly explain why she stayed in the relationship and did not leave her home; why she did not call the police or get other assistance before acting; *and why she believed that at the time she responded the danger she faced was imminent, posed a threat to her life, and was therefore different and more serious than other times when she had been beaten, had not acted, and had survived.*

*The purpose of expert testimony has been to educate the judge and jury about the common experiences of battered women, to explain the context in which an individual battered woman acted, so as to lend credibility and provide a context to her explanation of her actions.*

*Expert testimony can give the judge and jury information concerning the common experiences and characteristics of battered women in order to refute widely held myths and misconceptions*

---

[11] L. Walker, *The Battered Woman*, P. XV (1979).

*concerning battered women that would interfere with judge or juror ability to evaluate the woman's action fairly.* Judges and jurors may accept the appropriateness of woman abuse as part of the marital relationship, assume the woman deserved or was responsible for the brutality, and blame her for not ending the relationship. Expert testimony can present a different picture by demonstrating that the battered woman was a victim. Introduction of expert testimony is important because a battered woman who explains a homicide as a reasonable and necessary response to abuse in the home, threatens deeply held stereotypes of appropriately submissive female conduct and of patriarchal authority. Expert testimony on the experiences of battered women can also answer specific questions that are in judges' and jurors' minds of why the battered woman didn't leave her home, why she may not have reported the battery to the police, *and, most importantly, why she believed that the danger she faced on the particular occasion was life-threatening. In short, it can show that her conduct was reasonable.* (Énfasis suplido.)[12]

▮ Al amparo de este razonamiento, muchos tribunales estatales norteamericanos han determinado que es admisible el testimonio pericial sobre el síndrome de mujer maltratada para: (1) disipar la común pero equivocada percepción de que una persona normal o razonable no hubiera permanecido en una relación abusiva de tal naturaleza; (2) para fortalecer la teoría de la defensa propia, brindando credibilidad a la versión de los hechos presentada por la acusada, y (3) para demostrar la razonabilidad del temor de la acusada de que se encontraba en inminente peligro de muerte o de serio daño corporal. A esos efectos, véanse: *State v. Hennum*, 441 N.W.2d 793 (1989); *State v. Hanson*, 793 P.2d 1001 (App. Wash. 1990); *State v. Koss*, 551 N.E.2d 970 (1990); *Com. v. Craig*, 783 S.W.2d 387 (1990); 31A Am. Jur. 2d Sec. 195.

Nuestra jurisprudencia está huérfana de expresiones, o criterios rectores, sobre el tema; ello, naturalmente, debido al hecho de que la cuestión aquí planteada es una de "pri-

---

[12] Schneider, *Women's Self-Defense Work and the Problem of Expert Testimony on Battering (1986)*, en *Representing ... Battered Women who Kill*, 1989, págs. 61–63.

mera impresión" en nuestra jurisdicción. Un estudio de las decisiones emitidas en las jurisdicciones estatales norteamericanas, así como en el foro federal, demuestra que la *norma mayoritaria* imperante en las mismas requiere no sólo que el testimonio pericial sobre el "síndrome de mujer maltratada" sea precedido por evidencia de la evaluación psicológica de la acusada a esos efectos, sino que dicha prueba pericial sea presentada dentro del contexto de una legítima defensa propia. Véanse, entre otros: *People v. Aris*, 264 Cal. Reptr. 167 (1989); *State v. Ciskie*, 751 P.2d 1165 (Wash. 1988); *State v. Kelly*, 478 A.2d 364 (N.J. 1984); *Borders v. State*, 433 So. 2d 1325 (1983); *State v. Anaya*, 438 A.2d 892 (Me. 1981). En otras palabras, en dichas jurisdicciones prueba sobre el "síndrome de mujer maltratada" no se considera como una defensa per se o independiente. En aquellas situaciones en que de la prueba desfilada no surgen los requisitos tradicionalmente exigidos por los tribunales respecto a la defensa propia, se ha excluido la evidencia pericial relacionada con el mencionado síndrome. Sobre ello, véanse: *State v. Walker*, 700 P.2d 1168 (App. Wash. 1985); *State v. Martin*, 666 S.W.2d 895 (1984); *State v. Leidholm*, 334 N.W.2d 811 (1983); *Fultz v. State*, 439 N.E.2d 659 (1982); *State v. Kelly*, 655 P.2d 1202 (Wash. 1982).

Somos del criterio que la norma jurisprudencial mayoritaria antes expuesta es una correcta y juiciosa que armoniza las posiciones en conflicto y que garantiza y protege adecuadamente no sólo los derechos de esas víctimas de maltrato sino los de la sociedad en general. En conclusión, resolvemos que en nuestra jurisdicción *es admisible* en evidencia, al amparo de las disposiciones de la Regla 52 de Evidencia, 32 L.P.R.A. Ap. IV,([13]) testimonio

---

([13]) Dicha disposición reglamentaria lee:
"Cuando conocimiento científico, técnico o especializado sea de ayuda para el juzgador entender la evidencia o determinar un hecho en controversia, un testigo

pericial sobre el "síndrome de mujer maltratada" dentro del contexto, y como complemento, de la prueba sobre defensa propia, *siempre y cuando* que se demuestre, a satisfacción del tribunal de instancia, que efectivamente se trata de un caso de "mujer maltratada", hecho que podrá ser establecido por prueba directa de ello o mediante la presentación en evidencia de una evaluación psicológica.

## IV

A la luz de lo antes expuesto, no cabe duda de que en el presente caso procede revocar la resolución recurrida. Como surge del resumen de los hechos que hiciéramos al comienzo de la ponencia, la propia prueba de cargo establece las bases para la presentación, por la defensa, del testimonio pericial sobre el "síndrome de mujer maltratada".[14]

Del testimonio prestado por el policía investigador —sobre las admisiones que le hiciera a éste la acusada peticionaria sobre lo alegadamente ocurrido la noche de los hechos— surgen los elementos, exigidos por nuestra jurisprudencia, relativos a la defensa propia; versión que es compatible con, o "corroborada" por, el testimonio prestado por el patólogo forense respecto a la localización y "trayectoria" de la herida que presentaba el occiso. Por otro lado, el testimonio del padre del occiso y del hermano de la acusada establecen, cuando menos prima facie, que efectivamente estamos ante un caso de "mujer maltratada".

*Procede, en consecuencia, la expedición del auto de certiorari radicado y la revocación de la resolución de fecha 6*

---

capacitado como perito en relación con la materia sobre la cual va a declarar podrá testificar en forma de opiniones o de otra manera." 32 L.P.R.A. Ap. IV, R. 52.

[14] Antes de comenzar su turno de presentación de prueba, la defensa le informó al tribunal de instancia, y a los señores del Jurado, que "su teoría surgiría de la prueba".

*de diciembre de 1991 emitida por el tribunal de instancia en el presente caso, devolviéndose el caso a dicho foro para la continuación de procedimientos ulteriores consistentes con lo aquí expuesto. Se dictará sentencia de conformidad.*

· El Juez Asociado Señor Hernández Denton emitió una opinión concurrente y de conformidad. La Juez Asociada Señora Naveira de Rodón emitió una opinión concurrente. El Juez Asociado Señor Alonso Alonso no intervino.

## – O –

Opinión concurrente emitida por la Juez Asociada Señora Naveira de Rodón.

Debido a las circunstancias específicas del caso de autos, concurrimos con el resultado. Sin embargo, la preocupación que sentimos ante el problema, cada día en aumento, de la violencia contra la mujer no nos permite estar de acuerdo con la mayoría de los integrantes de este Tribunal y nos obliga a expresarnos. Como señalara el Honorable Juez Asociado Señor Hernández Denton en su opinión disidente en *Pueblo v. Lacroix Correa*, 127 D.P.R. 557, 565 (1990):

Un estudio psicográfico realizado sobre la mujer puertorriqueña revela que el problema que la mayoría de las encuestadas identifica como más severo es la violencia conyugal. Un 58% de las mujeres así lo manifestó. McCann-Erickson, *Una Mujer, Mil Caras*, Estudio psicográfico de la mujer puertorriqueña, 1990, pág. 22.

Al tomar en consideración los niveles a los que han llegado las estadísticas sobre la violencia doméstica, este porcentaje no nos deb[e] sorprender. Según se desprende de los informes de la Policía de Puerto Rico de noviembre de 1989 a mayo de 1990, se han informado 7,806 incidentes de violencia doméstica. Y. Zayas, *La Ley Núm. 54 y la protección de la familia puertorriqueña*, Ponencia al Sexto Congreso Internacional sobre Derecho de Familia, 18 de octubre de 1990. Además, de los informes de la Comisión para la Asuntos de la Mujer se desprende que el

año pasado 83.88% de los casos de violencia contra la mujer ocurrieron a manos de sus esposos o compañeros.

Aun cuando reconocemos que se ha aprobado legislación para remediar y proteger a la mujer que es objeto de violencia doméstica, no obstante reconocemos que los esfuerzos para tratar de erradicar este mal social no le competen exclusivamente a la Rama Legislativa. Necesariamente tiene que haber un esfuerzo en conjunto de las tres ramas de gobierno —Ejecutiva, Legislativa y Judicial— encaminado a asumir la responsabilidad que la magnitud del problema requiere. Así lo expresamos en *Pueblo v. Esmurria Rosario*, 117 D.P.R. 884, 893–894 (1986), voto particular:

> Los jueces somos la última autoridad en el sistema judicial. Si no logramos manejar los casos de violencia, en este caso en específico contra la mujer, con el enfoque e interés judicial apropiados, corremos el peligro de hacer que estos crímenes sean considerados como algo trivial e insignificante. Por tales motivos, los jueces no podemos ignorar la seriedad de estos crímenes, en particular, los cometidos contra las mujeres. Restarles importancia limitaría la efectividad de la intervención judicial en este tipo de casos y agravaría un ya ingente problema social.

Así, pues, le compete a la Rama Legislativa aprobar las leyes, a la Rama Ejecutiva ponerlas en vigor y a la Rama Judicial interpretarlas. Nosotros, como Jueces poseedores de la última autoridad en el sistema judicial, tenemos el deber moral de no abstraernos de la realidad social al interpretar las leyes. También tenemos que fortalecer la confianza, un tanto perdida, que una víctima de maltrato tiene en las instituciones judiciales. Es dentro de este contexto que debemos considerar la teoría del "síndrome de mujer maltratada" como parte de la legítima defensa.

Como señala la opinión mayoritaria, se ha definido el término "mujer maltratada" como aquella que permanece en una relación en la cual su pareja la agrede de forma

cíclica y repetitiva.(¹) Este ciclo de maltrato se desarrolla a través de tres (3) fases diferentes. La primera se caracteriza por pequeños incidentes de maltrato que aumentan al pasar del tiempo. La mujer permanece pasiva, aunque trata de controlar o limitar el comportamiento abusivo del opresor. La segunda fase es el incidente de maltrato como tal. Se caracteriza por un acto de violencia en que el agresor pierde el control y la mujer se siente impotente para detener la agresión. La tercera y última fase comienza al cesar la violencia. El agresor siente remordimiento por su comportamiento y ruega por el perdón de su víctima. Al ella perdonarlo, comienza un período de calma. Si se repite este ciclo una segunda vez, se clasifica la mujer como "maltratada".(²)

El "síndrome de mujer maltratada" se ha definido como el conjunto de características específicas y los efectos del maltrato o abuso en la mujer.(³) Sin embargo, debemos señalar que no toda mujer maltratada sufre de este síndrome. Solamente aquellas que padecen esta condición son incapaces de responder de forma efectiva a los episodios de violencia por parte de su pareja, sintiéndose de este modo atrapadas en dicha situación.(⁴)

De otra parte, para que prospere la legítima defensa se exige la concurrencia de varios requisitos. Primero, que el acusado demuestre que tenía motivos fundados para creer que estaba en inminente peligro de muerte o grave daño corporal. Segundo, que haya necesidad racional del medio

---

(¹) W.W. Steele, Jr. y C.W. Sigman, *Reexamining the Doctrine of Self Defense to Accommodate Battered Women*, 18 (Núm. 2) Am. J. Crim. Law 169, 170 (1991).

(²) Steele y Sigman, *supra*, págs. 170-171; V. Mikesell Mather, *The Skeleton in the Closet: The Battered Woman Syndrome, Self-Defense, and Expert Testimony*, 39 (Núm. 2) Mercer L. Rev. 545, 553 (1988).

(³) M.R. Mahoney, *Legal Images of Battered Women: Redefining the Issue of Separation*, 90 (Núm. 1) Mich. L. Rev. 2, 36–37 (1991).

(⁴) Mahoney, *supra*, pág. 37

(⁵) D. Nevares-Muñiz, *Derecho Penal Puertorriqueño: Parte General*, Hato Rey, Inst. Desarrollo del Derecho, 1983, pág. 193..

utilizado para impedir o repeler el daño. Tercero, que no haya provocación de parte del que invocala defensa. Cuarto, que no infligió más daño que el necesario para repeler o evitar la agresión.[5]

Como correctamente señala la opinión mayoritaria, se ha invocado en los últimos años el "síndrome de mujer maltratada" para evaluar si la acusada actuó o no en forma prudente y razonable al quitarle la vida a su víctima. Este es el criterio objetivo, el cual requiere una "determinación de si una persona razonable en la posición del acusado, sabiendo lo que sabía y viendo lo que vio, crea necesario ultimar al agresor para evitar el daño". *Pueblo v. De Jesús Santana*, 100 D.P.R. 791, 798 (1972). Dicho criterio no permite al juzgador de hechos considerar alguna característica particular del acusado. El mismo, por lo tanto, resulta inadecuado al aplicarlo a una mujer maltratada, ya que no permite al juzgador de hechos considerar la experiencia personal de la mujer en una reiterada relación abusiva.[6] Como este criterio no toma en consideración los efectos de la violencia ni los avisos o amenazas de violencia futura, los tribunales que han reconocido las circunstancias de una mujer maltratada han adoptado un criterio denominado "subjetivo",[7] que es más amplio que el objetivo. Al amparo de esta posición, los tribunales deben permitir al juzgador de los hechos determinar si las circunstancias son suficientes para inducir a la acusada a creer honesta y razonablemente que tenía que hacer uso de la fuerza para defenderse del inminente daño.[8] El fundamento para sostener esto es que la conducta de la mujer maltratada debe

---

[6] Steele y Sigman, *supra*, págs. 175–176.

[7] Íd.; *State v. Leidholm*, 334 N.W.2d 811, 820 (1983); M.J. Willowghby, *Rendering Each Woman Her Due: Can a Battered Woman Claim Self-Defense when She Kills her Sleeping Batterer?* 38 (Núm. 1) Univ. Kan. L. Rev. 169, 189–191 (1989).

[8] Steele y Sigman, *supra*, págs. 176–177.

[9] Íd.

ser evaluada a base de un criterio que contemple las circunstancias que dieron lugar a su comportamiento.([9])

La evidencia sobre el "síndrome de mujer maltratada" se trae mediante prueba pericial, cuyo propósito principal es explicar la realidad de este síndrome, de tal manera que el juzgador de los hechos pueda decidir si la acusada tenía justificación al actuar en defensa propia.([10]) Esta posición reconoce la necesidad de romper con el esquema tradicional interpretativo de la legítima defensa.

En *Pueblo v. Martínez Solís*, 128 D.P.R. 135 (1991), ya liberalizamos un poco los criterios tradicionales de la defensa propia al considerar el hecho de que un acusado tenía conocimiento previo del carácter violento de la víctima en un caso en que éste invocaba la legítima defensa. Allí se buscaba justificar la conducta del acusado a la luz de su estado mental. El conocimiento previo del carácter violento de la víctima era medular para poder justificar la alegación de legítima defensa, por lo que se permitió la presentación de evidencia sobre actos previos específicos de la víctima. El propósito era probar el conocimiento que el acusado tenía sobre el carácter de la víctima y, por ende, la razonabilidad de su conducta conforme al temor que le pudo producir la confrontación con la víctima, a la luz del conocimiento que éste tenía de su carácter.

En los casos de la mujer maltratada se justifica aplicar el criterio subjetivo de razonabilidad al determinar si procede o no la legítima defensa. El interpretar la legítima defensa bajo esta nueva perspectiva requiere que liberalicemos su aplicación a la luz de las complejas situaciones en que se encuentra una víctima de maltrato. Una mujer maltratada, aunque actúe en defensa propia, frecuentemente lo hace de una manera que no enmarca dentro de los elementos y conceptos tradicionales de esta defensa. No reconocer, en el caso de la mujer maltratada, el elemento sub-

---

([10]) Steele y Sigman, *supra*, pág. 184.

jetivo del criterio de razonabilidad, equivale a ignorar la realidad y negarle a ésta el derecho a defender su vida o integridad corporal.[11] No podemos suscribir esta posición.

**– O –**

Opinión concurrente y de conformidad emitida por el Juez Asociado Señor Hernández Denton.

La opinión que hoy emite la mayoría de este Tribunal representa, al fin, el reconocimiento por este Foro de que la problemática de la mujer maltratada no puede ser ignorada o solapada durante mucho tiempo más.

Al resolver que es admisible el testimonio pericial sobre el "síndrome de mujer maltratada" como complemento de la defensa de legítima defensa, reconocemos la existencia de un problema grave de violencia contra la mujer y disipamos cualquier duda que surja respecto a la pasividad con la cual este Tribunal lo ha atendido.

Recientemente, examinamos el problema de violencia conyugal y la ineficacia de las instituciones jurídicas al adjudicar controversias en las que están involucradas mujeres maltratadas. Conscientes de la problemática de la violencia contra la mujer, exhortamos a los tribunales a tener mayor sensibilidad a las necesidades de estas víctimas:

> Este Tribunal no debe asumir una actitud pasiva ante tan grave situación. Tampoco debemos ignorar que muchas mujeres víctimas del maltrato y de la violencia consideran que el proceso judicial no atiende adecuadamente sus necesidades.
>
> . . . . . . . .
>
> Conscientes de este grave problema social, nos corresponde el deber ineludible de asegurar que las instituciones judiciales sean instrumentos rápidos y efectivos para vindicar los derechos de las víctimas del maltrato y no un obstáculo adicional que impida que las mujeres recurran al sistema de justicia

---

[11] Steele y Sigman, *supra*, pág. 185.

criminal. *Pueblo v. Lacroix Correa*, 127 D.P.R. 557, 565–566 (1990) opinión disidente.

También señalamos que estudios sociológicos llevados a cabo en Puerto Rico demuestran que "la poca probabilidad de castigo de ese comportamiento es un factor más en la larga lista de condiciones que inhiben a las mujeres de buscar remedio legal y social a esta forma de ataque a su persona". R. Silva Bonilla, *¡Ay!, ¡Ay! amor: no me quieras tanto ... (el marco social de la violencia contra las mujeres en la vida conyugal)*, Centro de Investigaciones Sociales de la Universidad de Puerto Rico, pág. 34.

Recordemos que el problema de las mujeres que han caído en el círculo de violencia familiar o que han incorporado o aprendido un comportamiento permanente de indefensión y luego matan a sus cónyuges, trasciende cualquier barrera académica, económica, religiosa y todos los esquemas de organización social que hoy se conocen:

> Battered women come from all types of economic, cultural, religious, and racial backgrounds. They are millionaires, and they are women on welfare; they are uneducated women, and they are practicing professionals with J.D.s and Ph.D.s; they are mothers, and they are childless; they are religious, and they are atheists; they live in rural areas, and in cities, and in small towns all over this country and all over the world. They are women like you. Like me. Like those whom you know and love. L. Walker, *Terrifying Love: Why Battered Women Kill and How Society Responds*, Nueva York, Harper and Row, 1989, págs. 101–102.

Sin embargo, y a pesar de que el problema está tan generalizado,[1] el mismo no ha sido atendido adecuadamente. Es por esta razón que, en ocasiones extremas, a la mujer que es objeto de continuo abuso sexual,

---

[1] Se estima que alguna forma de violencia física ocurre en el 50 ó 60 por ciento de las parejas en Estados Unidos y que sólo 25 por ciento de los incidentes de violencia son reportados a las autoridades. C. Cacy, *The Battered Woman's Syndrome Defense*, 34 (Núm. 2) U. Kan. L. Rev. 337 (1985–1986).

físico y sicológico no le queda otra salida que responder violentamente contra su cónyuge o compañero porque teme que su vida está en peligro. En estas circunstancias, la mujer está realmente entre la espada y la pared:

> "There's real Catch-22 for these women. The first or second time a woman seeks help, she's told by law officials, priest, relatives, you name it, to go home and try to patch things up. So for the fourteenth time, she's called a masochist for staying . there. And then when she shoots the guy, everyone's shocked." M. Heller, *Washington Post,* 4 de diciembre de 1977, pág. 1, en C. Cacy, *The Battered Woman's Syndrome Defense,* 34 (Núm. 2) Univ. Kan. L. Rev. 337, 347 (1985–1986).

Es evidente que ante esta gravísima problemática, la persona maltratada que mata en su legítima defensa, al igual que la que invoca la defensa de estado de necesidad, incapacidad mental o cualquiera de las causas de inimputabilidad o de exclusión de responsabilidad regulada en el Código Penal de Puerto Rico, merece la oportunidad de ofrecer la evidencia necesaria para que el juzgador de hechos pueda dirimir si están presentes los requisitos para que opere la misma.

Para lograr este propósito, el testimonio pericial es crucial:

> Expert testimony on battered women can serve four purposes in support of a self-defense claim. First, the expert can explain the cyclical nature of the battering relationship, which moves from the tension-building stage, to the violent stage, to the contrite, loving phase, and then begins again. ... Second, after interviewing the defendant, the expert can testify that the defendant fits within the class of battered women. ... Third, the expert's testimony can substantiate the defendant battered woman's claim that she honestly believed she needed to use deadly force. ... Finally, the expert can testify to *the reasonableness of the defendant's beliefs that the harm was imminent* and that deadly force was justified. (Énfasis suplido.) Comentario, *The Admissibility of Expert Testimony on the Battered Woman Syndrome in Support of a Claim of Self-Defense,* 15 (Núm. 1) Conn. L. Rev. 121, 130–132 (1982–1983).

Cabe señalar que la norma que hoy adoptamos no establece que la única forma de presentar prueba del síndrome es mediante testimonio pericial. Para tratar de establecer que está presente dicho fenómeno sicológico es permisible cualquier evidencia pertinente que sea admisible según nuestro ordenamiento probatorio, siempre y cuando se den las circunstancias requeridas por la opinión mayoritaria, a saber: que se establezca que se está realmente ante una mujer maltratada y que se dé "dentro del contexto, y como complemento, de la prueba sobre defensa propia ...". Opinión mayoritaria, pág. 946.

Por otro lado, la opinión emitida hoy no debe interpretarse como un estímulo a los abogados de defensa para que levanten el síndrome como causa de exclusión de responsabilidad dentro de la legítima defensa de forma viciosa e indiscriminada cada vez que se encuentran con una mujer que ha dado muerte a su cónyuge o a la persona con quien sostiene una relación de pareja. Este, claramente, no puede ser el propósito.

No obstante, la opinión que emite la mayoría es de importancia en el reconocimiento del problema del abuso contra la mujer. Estamos enteramente conformes con ella y nos satisface grandemente el papel activo que hoy asume este Tribunal al atender tan severa situación.