ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| EL PUEBLO DE PUERTO RICO<br><br>Apelado<br><br>v.<br><br>CARLOS ANÍBAL ROSADO MARTÍNEZ<br><br>Apelante | KLAN202400606 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de Carolina<br><br>Caso Núm.:<br>FVI2023G0015-0017<br>FLA2023G0105-0107<br><br>Sobre:<br>Art. 93(A) 1er Grado y Tent. Art. 93 (2 cs) C.P. 2012; Art. 6.14 Ley 168 L.A. (3cs) |

Panel integrado por su presidenta, la Juez Mateu Meléndez, la Jueza Prats Palerm y el Juez Sánchez Báez[1]

Sánchez Báez, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 1 de diciembre de 2025.

Compareció ante nos el Sr. Carlos Aníbal Rosado Martínez (en adelante, "señor Rosado Martínez" o "apelante"), mediante un recurso de *Apelación* presentado el 20 de junio de 2024. Nos solicitó la revocación de las sentencias emitidas el 21 de mayo de 2024, notificadas el 31 de mayo de 2024, por el Tribunal de Primera Instancia, Sala Superior de Carolina (en adelante, "foro primario" o "foro *a quo*"). Mediante estas declaró al apelante culpable de un cargo por violación al Artículo 93 (a) y de dos cargos por tentativa de violación al mismo artículo de la Ley Núm. 146-2012, conocida como el *Código Penal de Puerto Rico* (en adelante, "Código Penal"), *infra*, así como de tres cargos por violación al Artículo 6.14 (b) de la Ley Núm. 168-2020, conocida como la *Ley de Armas de Puerto Rico de 2020* (en adelante, "Ley de Armas"), *infra*. Por la comisión de todos

[1] Mediante la Orden Administrativa OATA-2025-064 emitida el 6 de mayo de 2025 se designó a la Juez Ana M. Mateu Meléndez en sustitución del Juez Félix R. Figueroa Cabán.

Número Identificador

SEN2025 _____

esos delitos, el apelante fue sentenciado a cumplir una pena total de 129 años de reclusión.

Por los fundamentos que expondremos a continuación, **se confirman** las *Sentencias* recurridas.

-I-

Por hechos ocurridos el 1 de julio de 2023, el Pueblo de Puerto Rico presentó siete denuncias contra el señor Rosado Martínez. Luego de la determinación de causa probable para acusar, el Ministerio Público presentó las acusaciones correspondientes. En lo pertinente, se le acusó de: 1) dar muerte al ser humano Tommy Lee Grays (en adelante, "Tommy"); 2) realizar actos inequívocos e inmediatos dirigidos a causar la muerte de los señores Maurice Gaines (en adelante, "señor Gaines") y Aaron Proctor (en adelante, "señor Proctor"), a quienes les disparó con un arma de fuego, causándoles heridas que requirieron hospitalización; 3) portar un arma de fuego sin poseer una licencia, y 4) apuntar y disparar un arma de fuego contra los mencionados perjudicados.

Luego de los trámites pertinentes, el 4 de marzo de 2024 comenzó el juicio en su fondo, el cual se extendió hasta el 12 de marzo de 2024. Aquilatada la prueba presentada en el juicio, el foro *a quo* emitió varias sentencias. Específicamente, mediante estas declaró al señor Rosado Martínez culpable de los siguientes delitos: (i) violación al Artículo 93 (a) del Código Penal (asesinato en primer grado), por lo cual lo sentenció a 99 años de reclusión;[2] (ii) dos cargos de tentativa de violación al Artículo 93 (a) del Código Penal (asesinato en primer grado), por lo cual lo sentenció a 20 años,[3] ambas penas concurrente entre sí y con el asesinato en primer grado, y (iii) tres cargos de violación al Artículo 6.14 (b) de la Ley de

---

[2] Art. 93 del Código Penal, 33 LPRA § 5142.
[3] *Id.*

Armas, por los cuales lo sentenció a 5 años en cada uno,[4] duplicados en virtud del Artículo 6.01 de la Ley de Armas, para un total de 30 años.[5] Las penas impuestas por la Ley de Armas fueron declaradas consecutivas a las impuestas por el Código Penal, para una pena total de 129 años de reclusión.

Inconforme, el señor Rosado Martínez recurrió antes nos mediante un recurso de *Apelación* y esbozó los señalamientos de error siguientes:

A. Erró el Juez Peña Ríos en la apreciación de la prueba oral, documental y digital, al determinar que el Estado probó más allá de duda razonable la culpabilidad del apelante por el delito de Artículo 93 inciso (a); las dos tentativas de asesinato del C.P. 2012, según imputados.

B. Erró el Juez al emitir fallo de culpabilidad, a pesar de que los fiscales no pudieron establecer la suficiencia de la prueba que se requiere para establecer, más allá de duda razonable, los elementos correspondientes al delito de asesinato en primer grado, especialmente ante la ausencia de prueba sobre el estado mental del apelante de "a propósito" y "con conocimiento" no empecé estos haber sido alegados en las acusaciones.

C. Erró el Juez al emitir fallo de culpabilidad, a pesar de que, en la alternativa, se cumplieron con todos los requisitos legales para atenuar la responsabilidad criminal del apelante al configurarse todos los elementos del delito de asesinato atenuado.

D. Erró el Juez al declarar culpable al apelante en dos cargos de tentativa de asesinato al amparo de los incisos a y d del Artículo 93 del C. P. 2012, a pesar de que las acusaciones criminales instadas por el Ministerio Público eran insuficientes en derecho para que recaiga una convicción válida, ya que en el cuerpo de los pliegos acusatorios no se alegaron todos los elementos de los delitos imputados de ninguna de las modalidades de asesinatos alegadas en los mencionados incisos.

E. Erró el Juez al declarar culpable al apelante en el cargo de asesinato en primer grado inciso (a) del Artículo 93 y dos tentativas de asesinato del C.P. 2012, a pesar del fallo absolutorio por el cargo relacionados con la Ley de Armas impedía como cuestión de derecho la convicción por el delito de asesinato y tentativa de asesinato en primer grado.

F. Erró el Juez al declarar culpable al apelante en el cargo de asesinato en primer grado inciso (a) del Artículo 93 y dos tentativas de asesinato del C.P. 2012, al negarle aplicar las presunciones contenidas en el Artículo 25 y 25 (a) del Código Penal de 2012, según enmendado, particularmente la legítima defensa ante el inminente peligro del apelante o su compañera consensual sufrir grave daño corporal y/o la muerte de los alegados perjudicados o víctimas.

---

[4] Art. 6.14 de la Ley de Armas, 25 LPRA § 466m.
[5] Art. 6.01 de la Ley de Armas, 25 LPRA § 466.

Conforme a lo dispuesto en la Regla 29 del Tribunal de Apelaciones, según enmendada, *In re Aprob. Enmdas. Reglamento TA*, 2025 TSPR 42, pág. 45, 215 DPR __ (2025), y por argüirse que el foro primario erró en la apreciación de prueba oral, el apelante presentó ante esta Curia la transcripción del juicio. Esta quedó estipulada por las partes el 23 de octubre de 2024. Luego de varios trámites, el 3 de julio de 2025, el apelante presentó su alegato.

Por su parte, el 4 de septiembre de 2025, la Oficina del Procurador General presentó el *Alegato del Pueblo*.

Con el beneficio de la comparecencia de ambas partes y la transcripción de la prueba oral, procedemos a exponer la normativa jurídica aplicable al caso ante nuestra consideración.

-II-

**A. Presunción de inocencia y duda razonable**

La Constitución de Puerto Rico reconoce en la Sección 11 del Artículo II el derecho fundamental de la presunción de inocencia. Const. PR art. II, sec. 11. Esto es que un acusado no tiene la obligación de presentar prueba en su defensa o de que es inocente. *Pueblo v. Meléndez Monserrate*, 214 DPR 547, 559 (2024). Entiéndase, le corresponde al Estado la obligación de presentar evidencia y de cumplir con la carga de la prueba para establecer la culpabilidad del acusado. *Pueblo v. Irizarry*, 156 DPR 780, 786-787 (2002). A los fines de rebatir esa presunción, las reglas 110 de Procedimiento Criminal y de Evidencia requieren que la culpabilidad de una persona acusada sea probada más allá de duda razonable. 34 LPRA Ap. II, R. 110 y 32 LPRA Ap. VI, R. 110. Para cumplir con ese estándar, y por consiguiente controvertir la presunción constitucional, el Ministerio Público tiene que presentar prueba suficiente y satisfactoria sobre: (1) cada uno de los elementos del delito, (2) su conexión con el acusado y (3) la intención o negligencia criminal de este. *Pueblo v. Meléndez Monserrate*, supra, pág. 560.

Cumplir con esa máxima es un imperativo del debido proceso de ley. *Pueblo v. Irizarry*, supra, pág. 786.

Ahora bien, el estándar probatorio de más allá de duda razonable no requiere que se tenga que probar el caso criminal con certeza matemática. *Pueblo v. Toro Martínez*, 200 DPR 834, 856 (2018); *Pueblo v. Bigio Pastrana*, 116 DPR 748, 761 (1985). Lo que nuestro ordenamiento jurídico requiere es prueba suficiente y satisfactoria, es decir, que produzca certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido. *Pueblo v. Toro Martínez,* supra. Por ende, la duda razonable que impide encontrar culpable al acusado no es una mera duda especulativa o imaginaria, o cualquier duda posible; es la insatisfacción racional de la conciencia del juzgador con la prueba presentada producto de todos los elementos de juicio del caso. *Id.*, Véase, además, *Pueblo v. Irizarry*, supra, pág. 788; *Pueblo v. Bigio Pastrana*, supra, pág. 761. Es decir, "la duda razonable debe ser el resultado de la consideración serena, justa e imparcial de la totalidad de la evidencia del caso o de la falta de suficiente prueba en apoyo de la acusación". *Pueblo v. Irizarry*, supra. Como bien dispuso el Tribunal Supremo: "En concreto, la duda razonable existe cuando el juzgador de los hechos siente en su conciencia insatisfacción o intranquilidad con la prueba de cargo presentada". *Pueblo v. García Colón I*, 182 DPR 129, 175 (2011). De igual modo ocurre "cuando el juzgador queda insatisfecho con la prueba presentada". *Pueblo v. Santiago*, 176 DPR 133, 142 (2009).

La determinación de si se probó la culpabilidad del acusado más allá de duda razonable es revisable en apelación. Ahora bien, en esa delicada función revisora se debe tener presente que "la apreciación de la prueba corresponde, en primera instancia, al foro sentenciador por lo cual los tribunales apelativos sólo intervendremos con dicha apreciación cuando se demuestre la

existencia de pasión, prejuicio, parcialidad o error manifiesto". *Pueblo v. Irizarry*, supra, págs. 788-789. Véase, además, *Pueblo v. Maisonave Rodríguez*, 129 DPR 49 (1991). Asimismo, podremos intervenir cuando la apreciación de la prueba no concuerde con la realidad fáctica o esta sea inherentemente imposible o increíble. *Pueblo v. Irizarry*, supra, pág. 789.

Esta norma se fundamenta en el hecho de que "los foros de instancia están en mejor posición para evaluar la prueba desfilada, pues tienen la oportunidad de observar y escuchar a los testigos y, por ello, su apreciación merece gran respeto y deferencia". *Pueblo v. Acevedo Estrada*, 150 DPR 84, 99 (2000).

De otro lado, nuestro ordenamiento jurídico no requiere una cantidad específica de testigos para probar la culpabilidad de un acusado más allá de duda razonable. *Pueblo v. Toro Martínez*, supra, pág. 859. Al contrario, el testimonio de un testigo por sí solo, de ser creído, es suficiente para sostener un fallo condenatorio aun cuando no fue un testimonio perfecto. Le corresponde al foro primario resolver los asuntos de credibilidad de un testigo cuando haya partes de su testimonio que sean aceptables. *Id.*, pág. 860. Véase, además, *Pueblo v. Chévere Heredia*, 139 DPR 1, 15-16 (1995). De ese modo, si un testigo se contradice, lo que está en juego es su credibilidad y es al foro primario a quien le corresponde resolver el valor probatorio de su testimonio. *Pueblo v. Toro Martínez*, supra, pág. 861. Adviértase que el testimonio perfecto no existe, y en lugar de ser indicativo de la verdad, es altamente sospecho, pues generalmente es producto de fabricación. *Pueblo v. Cabán Torres*, 117 DPR 645, 656 (1986).

**B. Legítima defensa**

La legítima defensa como causa de exclusión de responsabilidad penal se encuentra establecida en el Artículo 25 del

Código Penal, 33 LPRA § 5038. En esta disposición se establece lo siguiente:

> No incurre en responsabilidad penal quien defiende su persona, su morada, sus bienes o derechos, o la persona, morada, bienes o derechos de otros en circunstancias que hicieren creer razonablemente que se ha de sufrir un daño inminente, siempre que haya necesidad racional del medio empleado para impedir o repeler el daño, falta de provocación del que ejerce la defensa, y que no se inflija más daño que el necesario para repeler o evitar el daño.
>
> Cuando se alegue legítima defensa para justificar el dar muerte a un ser humano, es necesario creer razonablemente que al dar muerte al agresor, el agredido o la persona defendida se hallaba en inminente o inmediato peligro de muerte o de grave daño corporal. Para justificar la defensa de la morada, vehículo, lugar de negocios o empleo, las circunstancias indicarán una penetración ilegal o que la persona que se halle en la morada, vehículo, lugar de negocios o empleo, tenga la creencia razonable que se cometerá un delito, de acuerdo a lo establecido en el Artículo 25A. Para justificar la defensa de bienes o derechos, las circunstancias indicarán un ataque a los mismos que constituya delito o los ponga en grave peligro de deterioro o pérdida inminente.

*Id.*

La doctora Dora Nevares Muñiz define la legítima defensa como "una eximente de amplia cobertura para justificar el daño a otra persona o a sus bienes cuando la persona, bienes o derechos de quien invoca la defensa, o de un tercero, están bajo ataque o peligro inminente de parte de la persona que provocó la situación". D. Nevares Muñiz, *Código Penal de Puerto Rico*, 4ta ed., San Juan, 2019, págs. 52-53. Véase, además, *Pueblo v. Torres Rodríguez*, 119 DPR 730, 748 (1987).

Esta defensa afirmativa exige la concurrencia de varios requisitos que la propia disposición legal enumera. *Pueblo v. González Román*, 129 DPR 933, 940 (1992). Particularmente, se requiere el cumplimiento de los siguientes elementos: "creencia razonable de que se ha de sufrir un daño inminente; necesidad racional del medio utilizado para impedir o repeler el daño; ausencia de provocación de parte del que invoca la defensa; no infligir más daño que el necesario para repeler o evitar la agresión o el daño inminente". D. Nevares Muñiz, *op. cit.,* pág. 53. Véase, además,

*Reyes Salcedo v. Policía de PR,* 143 DPR 85, 98 (1997); *Pueblo v. González Román,* 138 DPR 691, 700-701 (1995).

Respecto al primer requisito, el daño inminente, se "presupone que la persona actúa para prevenir un daño inminente o para repeler un ataque o daño que se está llevando a cabo". D. Nevares Muñiz, *op. cit.,* pág. 54. En otras palabras, "la persona tiene que razonablemente creer que el ataque, personal o contra sus bienes o los de un tercero, se va a producir en el futuro inmediato; o si ya se ha iniciado, creer razonablemente que es necesario intervenir para evitar un daño más grave". *Id.* El Tribunal Supremo ha expresado que, para justificar la defensa propia, es necesario que concurran circunstancias que exciten el temor de una persona prudente y razonable. Por ello, se requiere que quien invoca la defensa crea —como lo haría un buen padre de familia— que sufrirá un daño inminente o este ya se está llevando a cabo. *Reyes Salcedo v. Policía de PR,* supra, págs. 98-99; *Pueblo v. Torres Rodríguez,* supra, pág. 748. Se analiza si una persona prudente y razonable en la posición del acusado, sabiendo lo que sabía y viendo lo que vio, consideraría necesario ultimar al agresor para evitar el daño. *Pueblo v. De Jesús Santana,* 100 DPR 791, 798 (1972). Sin embargo, no es necesario exigir que el agredido deba retroceder hasta colocarse en una posición de indefensión antes de defenderse; incluso puede perseguir al atacante si ese curso de acción es indispensable para preservar su vida. *Id.*

En cuanto al segundo requisito —la necesidad racional del medio empleado—, se requiere examinar "la gravedad del ataque, naturaleza e importancia del bien jurídico tutelado, condiciones personales de las partes, naturaleza del medio empleado, [y] que el medio empleado sea apropiado con relación al tipo o gravedad del ataque, así como también con relación a la calidad del bien defendido". D. Nevares Muñiz, *op. cit.,* pág. 54. No obstante, debe

tenerse presente que la magnitud de la agresión, aunque variable, no puede ser tal que inflija un daño mayor que aquel que se pretende evitar, ni puede estar fuera de proporción con la provocación ocurrida. *Id.,* pág. 55. Véase, además, *Reyes Salcedo v. Policía de PR,* supra, pág. 99.

El tercer requisito es la falta de provocación por parte de quien invoca la legítima defensa. Al respecto, la norma es que "quien originalmente provoca un ataque, no debe luego beneficiarse de la legítima defensa para repelerlo". D. Nevares Muñiz, *op. cit.,* pág. 55. La excepción se presenta cuando la provocación inicial es un acto menor y la respuesta de quien resulta víctima constituye un exceso que exige un segundo acto defensivo del primero. *Id.*

El cuarto y último criterio requiere que no se inflija más daño que el necesario para repeler el ataque. Es decir, se examina "la gravedad del daño que se ocasiona por quien invoca la legítima defensa". *Id.* Para su evaluación, se analiza la proporcionalidad entre el daño causado por quien se defiende y el daño que intentaba evitar. *Id.* No obstante, el Tribunal Supremo ha reconocido que, al no ser un acto matemático, es imposible exigir precisión absoluta al juzgar la conducta defensiva, especialmente cuando los hechos ocurren con tal rapidez e imprevistamente que el agredido debe actuar conforme lo permite la inmediatez de sus reflejos. *Reyes Salcedo v. Policía de PR,* supra, pág. 100.

En los casos de muerte en defensa de un tercero, el Tribunal Supremo ha dispuesto que puede invocarse esta defensa si la persona en peligro hubiese estado justificada en utilizar la fuerza letal en su propia defensa. *Pueblo v. De Jesús Santana,* supra, pág. 797. Sin embargo, "[e]l que mata, [...], debe haber empleado todos los medios a su alcance, consistentes con su propia seguridad, para evitar que se le ocasionen daños o tener que privar de la vida a otra persona al defenderse". *Id.,* págs. 797-798.

**C. Asesinato en primer grado y asesinato atenuado**

El Artículo 92 del Código Penal establece que el "[a]sesinato es dar muerte a un ser humano a propósito, con conocimiento o temerariamente". 33 LPRA § 5141. Este delito está dividido en varias modalidades: asesinato en primer grado, segundo grado y asesinato atenuado.

El asesinato en primer grado está tipificado en el Artículo 93 del Código Penal. 33 LPRA § 5142. En lo pertinente, el inciso (a) dispone que constituye asesinato en primer grado el "perpetrado por medio de veneno, acecho, tortura, estrangulamiento, sofocación o asfixie posicional, **o a propósito o con conocimiento**". *Id.* (Énfasis suplido). El término "a propósito" se define como: "Una persona actúa a propósito cuando el objetivo consciente de la persona es cometer el delito". 33 LPRA § 5014.

Por su parte, el Artículo 22 del Código Penal define los elementos subjetivos del delito actuado "a propósito" o "con conocimiento". 33 LPRA § 5035. Establece lo siguiente:

Elementos subjetivos del delito.

(1) A propósito

(a) con relación a un resultado, una persona actúa "a propósito" cuando su objetivo consciente es la producción de dicho resultado.

(b) con relación a una circunstancia, una persona actúa "a propósito" cuando la persona cree que la circunstancia existe.

(2) Con conocimiento

(a) con relación a un resultado, una persona actúa "con conocimiento" cuando está consciente de que la producción del resultado es una consecuencia prácticamente segura de su conducta.

(b) con relación a un elemento de circunstancia, una persona actúa "con conocimiento" cuando está consciente de que la existencia de la circunstancia es prácticamente segura.

*Id.*

Por otro lado, el asesinato atenuado está tipificado en el Artículo 95 del Código Penal que dispone: "[t]oda muerte causada a

propósito, con conocimiento o temerariamente, que se produce como consecuencia de una perturbación mental o emocional suficiente para la cual hay una explicación o excusa razonable o súbita pendencia, [...]". 33 LPRA § 5144.

Al examinar este delito, el Tribunal Supremo ha expresado que, aunque se causa la muerte a otra persona, al "existir circunstancias atenuantes importantes, el delito y la pena cambian en beneficio del acusado". *Pueblo v. Guadalupe Rivera*, 206 DPR 616, 633 (2021). Específicamente, señaló que "la circunstancia atenuante consiste en que el acto del acusado *fue una reacción irreflexiva, pasional, súbita e inmediata, provocada por la víctima u otra persona actuando con ésta*". *Id.*, pág. 634 (citando a *Pueblo v. Negrón Ayala*, 171 DPR 406, 417 (2007)). De igual forma, concluyó que "presupon[e] que el autor de la muerte actuó movido por una provocación adecuada de tal naturaleza que lleve a una persona ordinaria a perder su dominio y actuar según sus impulsos mentales causados por la cólera, pendencia o emoción violenta". *Pueblo v. Guadalupe Rivera*, supra, pág. 634 (citando a *Pueblo v. Negrón Ayala*, supra, pág. 417).

En cuanto a la perturbación emocional o mental suficiente ante las circunstancias del caso, la doctora Dora Nevares Muñiz señala que lo crucial es determinar la razonabilidad de la perturbación. Es decir, se debe examinar:

> si hay una excusa razonable para la perturbación mental o emocional que produjo una muerte, y no si hubo provocación adecuada o no de parte de la víctima. La provocación, si la hubo, será un elemento, entre otros, para evaluar si existe una excusa razonable para la perturbación mental o emocional, que justifique atenuar la responsabilidad en el asesinato.

D. Nevares Muñiz, *op. cit.,* pág. 161.

Nótese que, en *Pueblo v. Guadalupe Rivera*, supra, pág. 634, n.41, el Tribunal Supremo citó con aprobación a *Pueblo v. Negrón Ayala*, supra, pág. 418, y a *Pueblo v. Lebrón*, 61 DPR 657, 667

(1943), para establecer que "[s]i no existe esa provocación o si habiendo existido [la misma] no es lo suficientemente grave y la actuación del matador está fuera de toda proporción con el grado de la provocación, el acto de dar muerte constituye asesinato aunque el acusado no hubiese preconcebido la [idea]".

En cuanto a la súbita pendencia, la norma es que no se requiere provocación previa. Solo se necesita "demostrar la existencia de una pelea súbita, en la cual participa sin la intención previa de matar o de causar grave daño corporal". D. Nevares Muñiz, *op. cit.,* pág. 161. En estos casos, si transcurre un lapso durante el cual la persona recupera su dominio o recapacita, entonces se trata de asesinato. Para evaluar ese lapso, se toma en consideración el tiempo que le tomaría a una persona común salir de ese estado de pasión o excitación. *Id.*, pág. 162. En cambio, en los casos de perturbación emocional o mental suficiente, podría ocurrir que la persona permanezca en dicho estado por un tiempo adicional en el subconsciente y que la reacción aflore posteriormente de manera inexplicable. *Id.*

Discutido el derecho aplicable, este Tribunal se encuentra en posición para resolver las controversias señaladas en el recurso de *Apelación.*

**-III-**

De entrada, es pertinente señalar que el señor Rosado Martínez hizo seis señalamientos de error en su *Apelación*; sin embargo, en su alegato renunció al error identificado con la letra (D). En consecuencia, resta por atender los otros cinco señalamientos, los cuales, por estar interrelacionados, se discutirán de forma conjunta.

En esencia, el apelante cuestiona que el foro primario lo haya encontrado culpable, más allá de duda razonable, de un cargo de asesinato en primer grado y dos cargos de tentativa de asesinato.

Sostiene que el Ministerio Público no probó más allá de duda razonable los elementos subjetivos requeridos para actuar "a propósito" o "con conocimiento". Tras exponer la prueba presentada en el juicio, argumenta que la alegada ausencia de evidencia sobre su estado mental impide sostener las condenas. Añade que su absolución por el cargo de violación al Artículo 6.05 de la Ley de Armas, 25 LPRA § 466d, priva al Ministerio Público de un anclaje importante para demostrar que actuó "a propósito" o "con conocimiento".

En la alternativa, el señor Rosado Martínez plantea que, debido a la súbita pendencia que presuntamente se produjo en los hechos, el delito que procedía era el de asesinato atenuado e, incluso, que correspondía la aplicación de la legítima defensa.

Por el contrario, el Ministerio Público sostiene que la prueba desfilada demostró que el señor Rosado Martínez, valiéndose de un arma de fuego, causó la muerte a una persona y estuvo a punto de causarla a otros dos individuos. Asimismo, argumenta que el apelante no logró demostrar que el foro primario incurrió en error manifiesto, prejuicio o parcialidad al apreciar la prueba testifical.

Respecto al planteamiento relativo a su absolución por violación al Artículo 6.05 de la Ley de Armas, *supra,* el Ministerio Público señala que ello no impide las demás condenas, pues una persona puede apuntar, disparar, matar y herir mortalmente aun cuando posee licencia para portar un arma. Así, distingue que una cosa es portar un arma sin la licencia correspondiente y otra muy distinta es el uso que se le dé a esa arma.

En cuanto al planteamiento alterno de que procedía un dictamen de culpabilidad por asesinato atenuado, la Oficina del Procurador General arguye que la prueba presentada no demostró que el apelante actuara movido por una perturbación mental o emocional suficiente. Señala que el cuadro de tensión fue iniciado

por el propio señor Rosado Martínez al golpear a una de las víctimas; que la subsiguiente persecución fue realizada por tres personas desarmadas como consecuencia de ese primer golpe, y que no se justifica dicho golpe por el mero hecho de que un hombre se aproximara a su pareja.

Por último, en cuanto a la legítima defensa, el Ministerio Público sostiene que no se satisfacen los requisitos para su procedencia, pues no existía un peligro inminente de sufrir un daño, no hubo necesidad racional del medio empleado, sí existió provocación por parte del apelante y se infligió más daño del necesario para repeler la presunta agresión.

Para atender adecuadamente estos señalamientos de error, procede resumir los hechos según la prueba presentada durante el juicio.

El 1 de julio de 2023, el señor Proctor, el señor Gaines, Tyra White Danielle (en adelante, "señora White"), Rhonda A. Proctor (en adelante, "señora Proctor"), Amani Grays (en adelante, "Amani") y Tommy se encontraban de vacaciones en Puerto Rico.[6] El señor Proctor es hermano de la señora Proctor y tío de Amani y Tommy.[7] La señora White es hermana de la señora Proctor.[8] A su vez, la señora Proctor es madre de Tommy.[9] Por último, el señor Gaines era el novio de la señora Proctor.[10]

Particularmente, ese día en horas de la tarde, casi al anochecer, todos acudieron a la playa de Isla Verde, en Carolina.[11] En un momento dado, el señor Proctor se alejó del grupo para

---

[6] Transcripción de la prueba oral (en adelante, "TPO"), Tomo I, págs. 14-16; Tomo III, pág. 18; Tomo IV, págs. 6-7 y 108; Tomo V, págs. 10-11.

[7] TPO, Tomo I, pág. 48; Tomo IV, págs. 68-69.

[8] TPO, Tomo IV, pág. 68

[9] TPO, Tomo I, págs. 142-143; Tomo II, pág. 122; Tomo IV, pág. 68.

[10] TPO, Tomo IV, págs. 7 y 68.

[11] TPO, Tomo II, pág. 121; Tomo III, págs. 31 y 34; Tomo IV, págs. 6, 25, 67 y 108; Tomo V, pág. 11.

conversar con mujeres en la playa y obtener sus números telefónicos. [12] Habló con una mujer y obtuvo su número, [13] y posteriormente caminó hacia el otro extremo de la playa, donde encontró a otra mujer, la señora Paloma Rivera Santiago (en adelante, "señora Rivera"), quien resultó ser la pareja del señor Rosado Martínez.[14] Este último trabajaba en Casa Cuba atendiendo a los  asociados del club en el área de la playa, en relación con las sillas y sombrillas.[15]

Cuando el señor Proctor se dirigió a la señora Rivera, el señor Rosado Martínez salió corriendo desde Casa Cuba, llegó hasta donde se encontraba el señor Proctor y lo golpeó en el área de la cabeza.[16] El señor Proctor cayó al suelo, pero se levantó de inmediato.[17] A consecuencia de ello, tanto el señor Proctor como el señor Rosado Martínez alzaron las manos en posición de pelear.[18] Al percatarse de la situación, el señor Gaines, Tommy, la señora Proctor y Amani corrieron hacia el señor Proctor para averiguar qué había ocurrido.[19] Ante ello, el señor Rosado Martínez retrocedió y luego salió corriendo hacia el interior de Casa Cuba.[20] El señor Proctor lo siguió,[21] al igual que el señor Gaines y Tommy.[22]

---

[12] TPO, Tomo IV, pág. 70.

[13] TPO, Tomo I, págs. 17 y 66-67; Tomo III, pág. 31; Tomo IV, págs. 110-111.

[14] TPO, Tomo I, págs. 17-18; Tomo II, págs. 35 y 119; Tomo IV, pág. 50 y 56-58.

[15] TPO, Tomo II, pág. 45; Tomo V, pág. 90; Tomo VI, pág. 6.

[16] TPO, Tomo I, págs. 19-20, 71 y 116-117; Tomo II, pág. 121; Tomo III, págs. 18, 31 y 43; Tomo IV, págs. 29, 111, 122, 125-126 y 134; Tomo V, págs. 14 y 35; Tomo VI, pág. 59, 99 y 106.

[17] TPO, Tomo III, pág. 103; Tomo IV, pág. 9; Tomo V, págs. 14 y 35; Tomo VI, págs. 59 y 99.

[18] TPO, Tomo I, pág. 21; Tomo II, pág. 119; Tomo III, pág. 34; Tomo IV, págs. 9, 72-73, 91-92, 112 y 135; Tomo VI, págs. 59-60 y 99.

[19] TPO, Tomo IV, págs. 29-30, 113 y 136-137; Tomo VI, pág. 61.

[20] TPO, Tomo I, págs. 21, 72-73; Tomo II, pág. 118; Tomo III, págs. 31, 58, 67 y 103-104; Tomo IV, pág. 75; Tomo V, pág. 90; Tomo VI, págs. 16 y 61.

[21] TPO, Tomo I, págs. 21, 111; Tomo II, págs. 116, 118 y 121; Tomo III, págs. 18, 31, 43-44, 59, 67 y 97; Tomo IV, págs. 94-95; Tomo V, pág. 90; Tomo VI, págs. 16 y 61.

[22] TPO, Tomo I, págs. 54, 73-75 y 84-85; Tomo II, págs. 116 y 118; Tomo III, págs. 18, 31, 43-44, 59, 67 y 97; Tomo IV, págs. 94-95; Tomo V, pág. 90; Tomo VI, págs. 16 y 61.

Todos entraron por un portón mientras gritaban.[23] Unos guardias de seguridad intentaron detener al señor Proctor, al señor Gaines y a Tommy, pero no lo lograron.[24] Poco después, entraron también la señora Proctor y Amani.[25] Ya dentro del local, el señor Rosado Martínez trató de lanzar una silla contra el señor Proctor.[26] Todos corrieron por el área de la barra, el vestíbulo, la piscina y la cancha.[27]

Luego salieron nuevamente por el mismo portón y regresaron al punto inicial en la playa. En ese momento, el señor Rosado Martínez tomó su cartera y se dirigió hacia un área cercana a un gazebo. El señor Proctor no pudo alcanzarlo, por lo que desistió de la persecución.[28] Allí, el señor Proctor se encontró a la señora Rivera y, mostrándose molesto, agresivo y confundido, comenzó a discutir con ella y a proferirle palabras soeces, hasta que la golpeó.[29] Ella también discutía con él.[30] La señora White trató de calmar al señor Proctor, sin éxito.[31]

---

[23] TPO, Tomo I, pág. 73; Tomo II, pág. 118; Tomo IV, pág. 113; Tomo V, pág. 100; Tomo VI, págs. 6-8.

[24] TPO, Tomo II, págs. 116 y 118; Tomo III, págs. 60 y 67-68; Tomo IV, págs. 9 y 31; Tomo V, pág. 105; Tomo VI, págs. 19-20

[25] TPO, Tomo II, págs. 121-122; Tomo III, págs. 45, 61 y 100-101; Tomo IV, págs. 95 y 137; Tomo V, pág. 15.

[26] TPO, Tomo I, págs. 23 y 76-80; Tomo III, págs. 77-78.

[27] TPO, Tomo II, págs. 116 y 118; Tomo III, págs. 44-47 y 69; Tomo V, págs. 91 y 108; Tomo VI, págs. 8 y 20-23.

[28] TPO, Tomo I, págs. 24, 86-87, 113 y 120; Tomo III, pág. 84; Tomo IV, pág. 32; Tomo V, págs. 93 y 95; Tomo VI, págs. 10, 62-63 y 100.

[29] TPO, Tomo I, págs. 24-26, 88, 114, 122 y 130; Tomo III, págs. 33, 48 y 88; Tomo IV, págs. 80, 96 y 99; Tomo VI, págs. 63-64. Existe, además, controversia en los testimonios sobre si las expresiones proferidas fueron dirigidas al señor Rosado o a la señora Rivera. El señor Proctor y la señora White declararon que el señor Proctor le manifestó a la señora Rivera que el señor Rosado era "una perra" y una "puta fría (*bitch*)". TPO, Tomo I, págs. 24-26 y 88-89; Tomo IV, pág. 80. Asimismo, el señor Proctor afirmó que no le pegó en la cara ni escupió la señora Rivera. TPO, Tomo I, pág. 91.

Por su parte, otros testigos declararon que las expresiones fueron dirigidas directamente a la señora Rivera. TPO, Tomo III, págs. 89-91 y 122. La propia señora Rivera testificó que dichas palabras se las dirigieron a ella. TPO, Tomo VI, pág. 64. Además, manifestó que el señor Proctor le propinó golpes en el rostro y la escupió. Incluso, indicó que ella tomó una botella para defenderse, pero que posteriormente la soltó. TPO, Tomo VI, págs. 66-68, 94-95 y 111.

[30] TPO, Tomo I, págs. 108 y 131.

[31] TPO, Tomo I, págs. 90 y 92-93; Tomo II, pág. 120; Tomo III, págs. 34, 48; Tomo IV, págs. 81 y 97-98; Tomo VI, págs. 65-66.

Unos segundos después, el señor Rosado Martínez regresó al lugar, sacó un arma de fuego de su cintura y les disparó a los tres hombres.[32] Primero le disparó al señor Proctor, luego a Tommy y finalmente al señor Gaines, quien se dirigía hacia el señor Rosado Martínez con la intención de detenerlo.[33] Asimismo, apuntó con el arma a la señora White.[34]

Luego de efectuar los disparos, el señor Rosado Martínez colocó el arma en un bolso, recogió sus pertenencias, entró nuevamente a Casa Cuba, abordó su vehículo y abandonó el lugar.[35]

El señor Rosado Martínez le disparó al señor Proctor en el costado, el estómago y el bíceps derecho.[36] Este tuvo que ser sometido a una cirugía abdominal y permanecer hospitalizado por varios días.[37] Por su parte, al señor Gaines recibió un disparo en el rostro, lo que provocó que la bala se fragmentara y le ocasionara múltiples fracturas en el cráneo.[38] Sufrió sangrado interno e inflamación cerebral.[39] Asimismo, perdió el conocimiento.[40] Fue entubado y su condición fue crítica.[41] Por último, Tommy falleció.[42]

Basado en esos hechos, es que el señor Rosado Martínez alega que no se probó más allá de duda razonable los elementos subjetivos requeridos de actuar "a propósito" o "con conocimiento". En la alternativa, sostiene que debe aplicarse la causa de exclusión de

---

[32] TPO, Tomo I, págs. 26-27, 125-126 y 148; Tomo II, págs. 116-118 y 120; Tomo III, págs. 19, 22-23, 33, 48-49, 98 y 126; Tomo IV, págs. 82-83 y 122; Tomo V, págs. 95 y 112-113; Tomo VI, págs. 14-15 y 69.

[33] TPO, Tomo I, págs. 50 y 52-53, Tomo II, págs. 117-118; Tomo III, págs. 19, 33 y 98-99; Tomo VI, pág. 112

[34] TPO, Tomo III, págs. 35 y 111.

[35] TPO, Tomo II, págs. 117-119; Tomo III, págs. 48-50; Tomo IV, pág. 86; Tomo V, págs. 96, 114 y 117-118; Tomo VI, págs. 10, 15, 26 y 70.

[36] TPO, Tomo I, págs. 28-29; Tomo V, pág. 22.

[37] TPO, Tomo I, págs. 34-36; Tomo II, pág. 124.

[38] TPO, Tomo I, pág. 49; Tomo IV, pág. 15.

[39] TPO, Tomo IV, pág. 15.

[40] TPO, Tomo IV, pág. 13.

[41] TPO, Tomo II, pág. 124.

[42] TPO, Tomo I, págs. 136 y 142; Tomo II pág. 114

responsabilidad penal de legítima defensa, o que su culpa debe atenuarse al delito de asesinato atenuado.

Luego de evaluar la transcripción de la prueba, así como los videos presentados en evidencia, este Tribunal concluye que el foro *a quo* no incurrió en pasión, prejuicio, parcialidad o error manifiesto en la apreciación de la prueba. Mucho menos puede concluirse, que su determinación no concuerde con la realidad fáctica o sea inherentemente imposible o increíble. Por el contrario, la prueba demuestra que efectivamente el señor Rosado Martínez cometió el delito de asesinato en primer grado "a propósito" o "con conocimiento".

El Artículo 93 del Código Penal, *supra,* requiere como uno de los elementos del delito del asesinato el que se pruebe la intención de causar la muerte. D. Nevares Muñiz, *op. cit.,* pág. 154. Esto implica los elementos subjetivos de actuar "a propósito" o "con conocimiento". El Artículo 22 del Código Penal, *supra,* define ambos conceptos. Una persona actúa "a propósito" cuando su objetivo consciente es la producción del resultado. En cambio, actúa "con conocimiento" cuando está consciente de que la producción del resultado es una consecuencia prácticamente segura de su conducta. A tales efectos, la doctora Dora Nevares Muñiz explica:

> El elemento subjetivo (*i.e.* propósito, conocimiento o temeridad) es un elemento de hecho a ser determinado por el juzgador de los hechos. En tal determinación, deberá atender a los hechos, actos y circunstancias que rodean el hecho que resultó en la muerte, la capacidad mental, motivación, manifestaciones y conducta del sujeto activo, y luego de evaluar todo lo anterior inferir racionalmente si hubo el estado mental requerido: ya sea intención de matar (en el lenguaje de los códigos anteriores) o mató a propósito, con conocimiento o deliberadamente.

D. Nevares Muñiz, *op. cit.,* pág. 150. Véase, además, *Pueblo v. Rivera Alicea*, 125 DPR 37, 45 (1989), en el que se indicó que el elemento subjetivo se "determin[a] a base de los hechos, los actos y las circunstancias que rodean la muerte, la capacidad mental, la motivación, las manifestaciones y la conducta del acusado".

Obsérvense también los ejemplos que ofrece la doctora Dora Nevares Muñiz sobre intención criminal en un asesinato: una

persona actúa a propósito cuando dispara cinco tiros a quemarropa para causar la muerte de otra; y actúa con conocimiento cuando dispara dos veces a una persona a una distancia de 20 pies. D. Nevares Muñiz, *op. cit.,* pág. 151.

En el presente caso, los actos prospectivos, concomitantes y retrospectivos del señor Rosado Martínez demuestran que su intención criminal era causar la muerte del señor Proctor, del señor Gaines y de Tommy, o que estaba consciente de que su conducta produciría dicho resultado. Nótense los siguientes hechos: el señor Rosado Martínez golpeó al señor Proctor por el mero hecho de que este se dirigió a su pareja, la señora Rivera; al ver que el señor Proctor trató de defenderse, huyó para evitar ser alcanzado; al regresar a la playa tomó su cartera —donde tenía el arma de fuego— y se ocultó; posteriormente regresó y disparó contra los tres hombres, dos de los cuales no habían tenido altercado alguno con él ni con su pareja, y finalmente abandonó la escena en su vehículo.

Todos esos hechos demuestran de manera indubitable su intención criminal. Ello pues, disparó contra los tres hombres consciente de que causar la muerte era una consecuencia prácticamente segura de su conducta. Máxime cuando el Tribunal Supremo ha expresado:

> Atacar con un arma a una persona desarmada es una actuación de la cual puede inferirse la intención de causar la muerte a dicha persona. En tales circunstancias, ello podría ser la consecuencia probable de tal acto. Mas aún si a la víctima se le dispara en más de una ocasión, a corta distancia y alcanzándola en la cara. El riesgo de muerte era sustancial.

*Pueblo v. Rivera Alicea,* 125 DPR 37, 45 (1989) (citas omitidas).

Así las cosas, el señor Rosado Martínez no tienen razón en sus primeros dos señalamientos de error. La prueba presentada demostró más allá de duda razonable todos los elementos de los delitos imputados, incluyendo asesinato en primer grado y su tentativa.

Asimismo, el hecho de que haya ocurrido un fallo absolutorio por el delito de violación al Artículo 6.05 de la Ley de Armas, *supra,* no afecta su intención criminal. Dicho artículo tipifica exclusivamente el delito de portar, transportar o usar un arma de fuego sin tener una licencia vigente. Que no se haya probado ese delito más allá de duda razonable —debido a que la certificación presentada incluía un segundo apellido que no correspondía al apelante— no guarda relación con la intención criminal manifestada al disparar. Máxime cuando una persona puede querer causar la muerte "a propósito" o "con conocimiento" incluso con un arma legalmente poseída. Por tanto, el señor Rosado Martínez tampoco tiene razón en su quinto señalamiento de error.

Concluido que el Ministerio Público logró probar la intención criminal requerida para el delito de asesinato en primer grado, el apelante plantea en sus señalamientos de error tercero y sexto, en la alternativa, que procedía aplicar la causa de exclusión de responsabilidad penal de legítima defensa o atenuar su responsabilidad penal al delito de asesinato atenuado. Ninguno de estos planteamientos tiene mérito.

En cuanto a la legítima defensa, el Artículo 25 del Código Penal, *supra,* exige el cumplimiento de los siguientes requisitos: 1) creencia razonable de que se ha de sufrir un daño inminente; 2) necesidad racional del medio utilizado para impedir o repeler el daño; 3) ausencia de provocación por parte de quien invoca la defensa, y 4) no infligir más daño que el necesario para repeler o evitar la agresión o el daño inminente.

Ninguno de estos criterios se satisface en el presente caso. Primero, de la prueba presentada no surge que el señor Rosado Martínez o la señora Rivera estuvieran en peligro de sufrir un daño

inminente.[43] Segundo, aun si se asumiera que existía algún riesgo, no había una necesidad racional de emplear un arma de fuego para repelerlo, pues las víctimas no poseían ningún tipo de arma. Tercero, fueron los propios actos del apelante los que provocaron los hechos, ya que golpeó al señor Proctor sin justificación, por el mero hecho de que este se acercó a conversar con su pareja. Cuarto, el señor Rosado Martínez infligió un daño sustancialmente mayor al necesario para repeler cualquier supuesto ataque, al ocasionar la muerte de una persona y herir de gravedad a otras dos, lo cual excede con creces la protección permitida por la doctrina de legítima defensa. Por tanto, no procede acoger la defensa afirmativa de legítima defensa.

Por último, en cuanto al asesinato atenuado, corresponde evaluar si, a pesar de que se causó la muerte a una persona, existían circunstancias atenuantes de tal entidad que modifiquen la naturaleza del delito y la pena en beneficio del acusado. Para ello, se requiere que los actos se produzcan como consecuencia de una perturbación mental o emocional suficiente, para la cual exista una explicación o excusa razonable, o que ocurra en el contexto de una súbita pendencia. En otras palabras, es necesario que la conducta del apelante haya sido una reacción irreflexiva, pasional, súbita e inmediata. Además, debe demostrarse que el señor Rosado Martínez actuó movido por una provocación adecuada, de tal naturaleza que llevaría a una persona ordinaria a perder su dominio y a actuar conforme a impulsos generados por la cólera, la pendencia o una emoción violenta.

---

[43] En este aspecto, es importante señalar que existe un conflicto en los testimonios presentados por los testigos. El señor Proctor declaró que, al regresar de la persecución, únicamente le gritó a la señora Rivera y la empujó. Por su parte, la señora Rivera aseveró que el señor Proctor, además de proferirle palabras soeces, le propinó dos golpes en el rostro y la escupió. Este asunto constituye una controversia de credibilidad, cuya adjudicación corresponde al foro primario. Este foro apelativo intermedio solo intervendrá en la apreciación si se demuestra que medió pasión, prejuicio, parcialidad o error manifiesto. *Pueblo v. Irizarry*, supra, págs. 788-789.

Un factor esencial en este análisis es la razonabilidad de la reacción. Es decir, procede examinar si existe una excusa razonable para la perturbación mental o emocional que produjo la muerte.

En este caso, el señor Rosado Martínez alega que, en ningún momento, mediaron oportunidades para un periodo de enfriamiento que permitieran concluir que actuó con la reflexión exigida para el asesinato en primer grado. Por el contrario, sostiene que durante todo el incidente hubo tensión continua, persecución activa y una reacción inmediata a lo que describe como una amenaza, consistente en que el señor Proctor insultó, escupió y agredió a la señora Rivera.

Sin embargo, el foro primario, al emitir un fallo de culpabilidad por asesinato en primer grado, rechazó que existiera una excusa razonable para la perturbación mental o emocional que mitigara la conducta del apelante. Ante ello, y a la luz de la ausencia de pasión, prejuicio, parcialidad o error manifiesto en la apreciación de la prueba, este foro apelativo intermedio debe otorgarles total deferencia a las determinaciones del foro *a quo*.

En ese sentido, este tribunal toma en consideración que el señor Rosado Martínez golpeó inicialmente al señor Proctor por el mero hecho de que este último trató de hablar con su pareja, la señora Rivera, quien estaba sentada en la playa. El apelante no tenía justificación alguna para iniciar la agresión. Luego de ello, el señor Proctor —en su defensa y acompañado por familiares— persiguió al señor Rosado Martínez. Tras salir de Casa Cuba, el apelante tomó su cartera, donde guardaba su arma de fuego, y se apartó de la situación. Fue entonces cuando el señor Proctor comenzó una discusión con la señora Rivera y la golpeó. Después de ese suceso, el señor Rosado Martínez regresó y disparó, no solo contra el señor Proctor, sino también contra los otros dos hombres, resultando uno de ellos muerto.

Cabe destacar que de la prueba presentada surge que el occiso, Tommy, no tuvo altercado alguno con el señor Rosado Martínez ni con su pareja.

Por tanto, los hechos demuestran que no existía una excusa razonable para la perturbación mental o emocional que produjera la muerte. Además, el que el señor Proctor discutiera, golpeara y escupiera a la señora Rivera —como consecuencia directa de que el señor Rosado Martínez lo agredió primero— no constituye provocación adecuada que justifique una reacción tan desproporcionada como lo es matar a una persona y disparar y herir a otras dos. A esos fines, resulta pertinente recordar lo expresado en *Pueblo v. Guadalupe Rivera*, supra, pág. 634, n.41: "[s]i no existe esa provocación o **si habiendo existido [la misma] no es lo suficientemente grave y la actuación del matador está fuera de toda proporción con el grado de la provocación, el acto de dar muerte constituye asesinato, aunque el acusado no hubiese preconcebido la [idea]**". (Énfasis suplido) (cita omitida).

Por consiguiente, este tribunal concluye que el señor Rosado Martínez tampoco tiene razón en sus señalamientos de error tercero y sexto.

**-IV-**

Por los fundamentos previamente expuestos, se **confirman** las sentencias apeladas.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones